# EXHIBIT 1

## CONVERTIBLE PROMISSORY NOTE

**PRINCIPAL AMOUNT**:

| Date | Amount (USD) |
|------|--------------|
| 2/06/2014 | 17,200 |
| 23/12/2014 | 6,450 |
| 6/01/2014 | 8,387 |
| 15/08/2014 | 11,129 |
| 29/09/2014 | 763 |
| 29/09/2014 | 8,616 |
| **Total** | **52,545** |

**EXECUTION DATE**: October 10th 2014

**INTEREST RATE**: 0%

**BORROWER**: INDO GLOBAL EXCHANGE(S) PTE, LTD.

**LENDER**: Dermot Monaghan

**DUE DATE**: On Demand

**AMOUNT FORGIVEN**: $14,539

**DATE FORGIVEN**: May 15th 2015

FOR VALUE RECEIVED, INDO GLOBAL EXCHANGE(S) PTE, LTD, a State of Nevada corporation ("Maker" or "Company"), the undersigned, promises, pursuant to the terms of this Convertible Promissory Note (the "Note"), to pay to Dermot Monaghan ("Payee") (Payee and any subsequent holders hereof are hereinafter referred to collectively as "Holder"), at such place, or places, as Holder may designate to Maker in writing from time to time, the amount of Thirty Eight Thousand and Six Dollars ($38,006.00).

The indebtedness evidenced hereby may be prepaid in whole or in part, at any time and from time to time, without premium or penalty.

In the event that the Note is not paid prior to the due date, the Holder shall have the right thereafter, exercisable in whole or in part, to convert the outstanding principal and accrued interest hereunder into a number of fully paid and non-assessable whole shares of the Company's $0.00001 par value common stock ("Common Stock") determined in accordance herewith.

The number of whole shares of Common Stock into which this Note may be voluntarily converted ("Conversion Shares") shall be determined by dividing the aggregate principal amount borrowed hereunder by $0.0001 (the "Note Conversion Price"); provided, however, that, in no

event, shall Holder be entitled to convert any portion of this Note in excess of that portion of this Note upon conversion of which the sum of (1) the number of shares of Common Stock beneficially owned by Holder and its affiliates (other than shares of Common Stock which may be deemed beneficially owned through the ownership of the unconverted portion of this Note or the unexercised or unconverted portion of any other security of Maker subject to a limitation on conversion or exercise analogous to the limitations contained herein) and (2) the number of shares of common stock issuable upon the conversion of the portion of this Note with respect to which the determination of this proviso is being made, would result in beneficial ownership by Holder and its affiliates of more than 9.9% of the outstanding shares of common stock of the Company.

Should the Company lower the par value of its Common Stock, the Holder may elect to have the Note Conversion Price reduced to a lower value, which will not be less than the par value of the Common Stock, by providing the Company with a written notice of Note Conversion Price reduction. Within ten (10) business days of receipt of such notice, the Company shall deliver to the Holder, a new note representing the reduced Note Conversion Price.

If the Holder elects to convert this Note or a portion thereof, the Holder shall provide the Company with a written notice of conversion setting forth the amount to be converted. Within ten (10) business days of receipt of such notice, the Company shall deliver to the Holder, certificate(s) for the Common Stock issuable upon such conversion and, if the entire principal amount hereunder was not so converted, a new note representing such balance.

IN WITNESS WHEREOF, INDO GLOBAL EXCHANGE(S) PTE, LTD has caused this Note to be executed in its corporate name and this Note to be dated, issued and delivered, all on the date first above written.

**INDO GLOBAL EXCHANGE(S) PTE, LTD**

By:

Name:　　　John O'Shea

Title:　　　President and Chief Executive Officer

Date:　　　May 15, 2015

## STOCK PURCHASE AGREEMENT

AGREEMENT (the "Agreement") made as of October 14, 2019, by and among Capitol Capital Corporation (the "Seller") and Mark Miller or its designee (the "Buyer"), and approved by a nonparty, the issuer, Indo Global Exchange(S) Pte, Ltd., a publicly traded company trading on the OTC Markets under the symbol IGEX, a Nevada corporation (the "Company").

## W I T N E S E T H:

WHEREAS, the Buyer desires to purchase from the Seller and the Seller desires to sell to the Buyer 166,750,000 Shares of common stock in the Company (the "Stock").

WHEREAS, the Stock price has fluctuated widely over the past one-year period and remains a very thinly traded stock. The Company does not maintain audited financial statements, is not current in its filings with OTC markets is considered by SEC standards as a "penny stock," making it very difficult, if not impossible, to deposit such shares at a brokerage account, let alone trade the shares, all of which render the shares far less valuable than the stated market price per share applicable to shares which are tradable.

WHEREAS, Buyer wishes to purchase the Stock from the Seller and the Seller desires to sell the Stock to the Buyer, for $102,000, subject to adjustments in the event of dramatic stock price changes.

NOW THEREFORE, in consideration of the mutual covenants and promises herein contained and upon the terms and conditions hereinafter set forth, the parties hereto, intending to be legally bound, agree as follows:

1. **PURCHASE AND SALE OF THE STOCK.**

Upon the terms and conditions herein contained, at the Closing (as hereinafter defined), the Seller hereby sells, assigns and transfers to the Buyer and the Buyer agrees to purchase from the Seller all of the rights of the Seller under the Stock, as of the date of the Closing, and all rights thereto, free and clear of all liens, claims, pledges, mortgages, restrictions, obligations, security interests and encumbrances of any kind, nature and description. The Seller assumes no obligation whatsoever concerning the prospect of the stock being susceptible to deposit in the brokerage account.

2. **CONSIDERATION.**

a. The purchase price of the Stock shall be $102,000 (the "Purchase Price"), payable in the form of an interest-bearing promissory note (the "Promissory Note"), issueable within two business days of a deposit and clearing of the Stock into a brokerage account (the "Issuance Date"), so as to be ready for trading. Interest shall be payable at the rate of .5% per month, subject to the Buyer being able to deposit the Stock within 45 days of the receipt of the Stock from the Seller.

b. In the event that the Stock price declines significantly such that the Buyer is unable to sell the Stock for at least 87.5% of the amount of the Purchase Price, then the amount of the Purchase Price shall be reduced by the amount of the excess of the Purchase Price over 80% of the actual sales proceeds, net of brokerage fees and other selling costs.

c. In the event that the sales proceeds exceed an amount equal to 1.2 times the amount of the Purchase Price, then the amount of the Purchase Price shall increase by an amount equal to 50% of the amount by which the sales proceeds, net of brokerage fees and other selling costs, exceed the Purchase Price.

3. **CLOSING.**

The closing of the transactions contemplated by this Agreement (the "Closing") shall take place upon execution of this Agreement, at which point, the Seller shall cause the Stock to be delivered to the Buyer, or the Buyer's broker.

4. **REPRESENTATIONS AND WARRANTIES OF SELLER.** The Seller hereby represents and warrants to the Buyer as follows:

4.1 <u>Status of the Seller and the Stock.</u> The Seller is the beneficial owner of the Stock, and such the Stock is free and clear of all mortgages, pledges, restrictions, liens, charges, encumbrances, security interests, obligations or other claims. The issuer of such shares, the Company, hereby approves this Agreement, as indicated below.

4.2 <u>Authorization: Enforcement.</u> (i) This Agreement has been duly executed and delivered by the Seller and (ii) this Agreement constitutes a legal, valid and binding obligation of the Seller enforceable against the Seller in accordance with its terms. The Transferred Rights reflect the rights afforded to stockholders generally and are legally transferable to Buyer.

4.3 <u>No Conflicts.</u> The execution, delivery and performance of this Agreement by the Seller and the consummation by the Seller of the transactions contemplated hereby (including, without limitation, the sale of the Stock to the Buyer) will not violate or conflict with, or result in a breach of any provision of, or constitute a default (or an event which with notice or lapse of time or both could become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, note, bond, indenture or other instrument to which Sellers is a party. The Seller is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court, government agency, regulatory agency, self-regulatory organization or stock market or any third party in order for it to execute, deliver or perform any of Seller's obligations under this Agreement in accordance with the terms hereof.

4.4 <u>Rule 144 Matters.</u> Seller is not, and for a period of at least ninety (90) days prior to the date hereof, has not been an "Affiliate" of the Company, as that term is defined in Rule 144 of the 1933 Act. The Seller is also not a person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the Company. Subsequent to the Closing, Seller will take no action

Stock Purchase Agreement

which would adversely affect the tacking for the benefit of the Buyer of Seller's holding period under Rule 144. The Seller has no reason to believe that the Stock cannot be issued without legend. The Stock has been paid for in full, more than three years ago.

5. **REPRESENTATIONS, WARRANTIES AND ACKNOWLEDGEMENTS OF THE BUYER.** The Buyer hereby represents warrants and acknowledges to the Seller as follows:

5.1 Sophisticated Investor. The Buyer is a sophisticated investor. The Buyer has sufficient knowledge and experience of financial and business matters to able to evaluate, and has made its own investigation of, the merits and risks of purchasing the Stock, and has had substantial experience in previous private and public purchases or securities and public purchases of securities.

5.2 Authorization: Enforcement. (i) This Agreement has been duly executed and delivered by the Buyer and (iii) this Agreement constitutes a legal, valid and binding obligation of the Seller enforceable against the Buyer in accordance with its terms.

6. **Miscellaneous.**

6.1 Binding Effect, Benefits. This Agreement shall insure to the benefit of, and shall be binding upon, the parties hereto and their respective successors and permitted assigns. Except as otherwise set forth herein, this Agreement may not be assigned by any party hereto without the prior written consent of the Company and of the other party hereto. Except as otherwise set forth herein, nothing in this Agreement, expressed or implied, is intended to confer on any person other than the parties hereto or their respective successors and permitted assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.

6.2 Notices. All notices, requests, demands and other communications which are required to be or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when delivered in person, or transmitted by telecopy or telex, or upon receipt after dispatch by certified or registered first class mail, postage prepaid, return receipt requested, to the party to whom the same is so given or made, at the following addresses (or such others as shall be provided in writing hereinafter):

(a) If to the Seller, to: David Goulding
davegoulding72@gmail.com

(b) If to the Buyer, to: Mark Miller
mjbuildersmn@gmail.com

6.3 Entire Agreement. This Agreement constitutes the entire agreement and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

6.4 Further Assurances. After the Closing, at the request of either party, the other party shall execute, acknowledge and deliver, without further consideration, all such further assignments, conveyances, endorsements, deeds, powers of attorney,

Stock Purchase Agreement

consents and other documents and take such other action as may be reasonably requested to consummate the transactions contemplated by the Agreement.

6.5     Headings. The section and other headings contained in this Agreement are for reference purposes only and shall not be deemed to be a part of this Agreement or to affect the meaning or interpretation of this Agreement.

6.6     Counterparts. This Agreement may be executed in any number of counterparts, each of which, when executed, shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

6.7     Government Law. This Agreement shall be construed as to both validity and performance and enforced in accordance with and governed by the laws of the State of Illinois, without giving effect to the conflicts of law principles thereof and any suit shall be brought in the state of Illinois, either in the County of Cook or Lake.

6.8     Severability. If any term or provision of this Agreement shall to any extent be invalid or unenforceable, the remainder of this Agreement shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

6.9     Amendments. This Agreement may not be modified or changed except by an instrument or instruments in writing executed by the parties hereto.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first above written.


**SELLER (Capitol Capital Corporation):**


David Goulding


**BUYER (Mark Miller):**


Mark Miller

Stock Purchase Agreement

page 4

# EXHIBIT 2

THIS NOTE AND THE COMMON STOCK ISSUABLE UPON CONVERSION OF THIS NOTE HAVE NOT BEEN AND WILL NOT BE REGISTERED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "1933 ACT")

(a)     In exchange for the payment of $25,000, plus services which have already been rendered, including the introduction of the Company to various individuals which the parties believe will be instrumental in facilitating the investment of the Minimum Capital and the Material Transaction, the Company will issue to Purchaser, a debenture convertible into stock of the Company (the "Convertible Debenture"), with a face amount of $100,000 convertible into stock in IGEX (the "IGEX Stock"), pursuant to the terms as set forth in the Convertible Debenture, attached hereto as Exhibit A. The terms of the Convertible Debenture shall include the right to receive 50% of the proceeds of the portion of any Material Transaction, in excess of $96,814.00. Any such consideration shall reduce, dollar for dollar the face value of the Convertible Debenture, but not in an amount greater than $75,000 – in other words, the payment to the Purchaser shall in no event reduce the face value of the convertible debenture, to an amount less than $25,000.

(b)     The closing shall occur on August 5, 2016, upon the transfer of the $25,000, and the conveyance of the Convertible Debenture (the "Closing").

**US $100,000.00 (One Hundred Thousand Dollars)**

Indo Global Exchange(s) Pte, Ltd., a Nevada corporation
**8% CONVERTIBLE REDEEMABLE NOTE**
**DUE FEBRUARY 5, 2017**

FOR VALUE RECEIVED, INDO GLOBAL EXCHANGE(S) PTE, LTD. (the "Company") promises to pay to the order of Capitol Capital Corporation and its authorized successors and permitted assigns ("Holder"), the aggregate principal face amount of One hundred thousand Dollars exactly (U.S. $100,000.00) on February 5, 2017 ("Maturity Date") and to pay interest on the principal amount outstanding hereunder at the rate of 8% per annum commencing on August 5, 2016. The interest will be paid to the Holder in whose name this Note is registered on the records of the Company regarding registration and transfers of this Note. The principal of, and interest on, this Note are payable at 20 Margaret Ave, Lawrence N.Y. 11559, initially, and if changed, last appearing on the records of the Company as designated in writing by the Holder hereof from time to time. The Company will pay each interest payment and the outstanding principal due upon this Note before or on the Maturity Date, less any amounts required by law to be deducted or withheld, to the Holder of this Note by check or wire transfer addressed to such Holder at the last address appearing on the records of the Company. The forwarding of such check or wire transfer shall constitute a payment of outstanding principal hereunder and shall satisfy and discharge the liability for principal on this Note to the extent of the sum represented by such check or wire transfer. Interest shall be payable in Common Stock (as defined below) pursuant to paragraph 4(b) herein.

This Note is subject to the following additional provisions:

1.        This Note is exchangeable for an equal aggregate principal amount of Notes of different authorized denominations, as requested by the Holder surrendering the same. No service charge will be made for such registration or transfer or exchange, except that Holder shall pay any tax or other governmental charges payable in connection therewith.

2.        The Company shall be entitled to withhold from all payments any amounts required to be withheld under applicable laws.

3.        This Note may be transferred or exchanged only in compliance with the Securities Act of 1933, as amended ("Act") and applicable state securities laws. Any attempted transfer to a non-qualifying party shall be treated by the Company as void. Prior to due presentment for transfer of this Note, the Company and any agent of the Company may treat the person in whose name this Note is duly registered on the Company's records as the owner hereof for all other purposes, whether or not this Note be overdue, and neither the Company nor any such agent shall be affected or bound by notice to the contrary. Any Holder of this Note electing to exercise the right of conversion set forth in Section 4(a) hereof, in addition to the requirements set forth in Section 4(a), and any prospective transferee of this Note, also is required to give the Company written confirmation that this Note is being converted ("Notice of Conversion") in the form annexed hereto as Exhibit A. The date of receipt (including receipt by telecopy) of such Notice of Conversion shall be the Conversion Date.

4.        (a)        The Holder of this Note is entitled, at its option, at any time after 180 days, to convert all or any amount of the principal face amount of this Note then outstanding into shares of the Company's common stock (the "Common Stock") without restrictive legend of any nature, at a price ("Conversion Price") for each share of Common Stock equal to 40% of the closing price (a discount of 60%) of the Common Stock as reported on the National Quotations Bureau OTCQB exchange, or any other exchange on which the Company's shares are traded or any exchange upon which the Common Stock may be traded in the future ("Exchange"), on the day prior to Notice of Conversion from the Holder. If the shares have not been delivered within 3 business days, the Notice of Conversion may be rescinded or repriced to the day preceding the receipt, if elected, in the sole discretion of the Holder. Such conversion shall be effectuated by the Company delivering the shares of Common Stock to the Holder within 3 business days of receipt by the Company of the Notice of Conversion. Once the Holder has received such shares of Common Stock, the Holder shall surrender this Note to the Company, executed by the Holder evidencing such Holder's intention to convert this Note or a specified portion hereof, and accompanied by proper assignment hereof in blank. Accrued, but unpaid interest shall be subject to conversion. No fractional shares or scrip representing fractions of shares will be issued on conversion, but the number of shares issuable shall be rounded to the nearest whole share. *Any conversion shall be subject to this* blocker provision, or Share Entitlement Limitation, preventing the Holder from the immediate receipt of shares of Indo Global's common stock, to the extent that, such a share issuance would result in the Holder being "beneficial owner" of more than 9.9999% of the then outstanding shares of common stock of Indo Global, including the number of shares of common stock

---

beneficially owned by the Holder's affiliates. Accordingly, instead of receiving and having possession of the full number of shares issueable other than with application of this blocker provision, such shares shall not be currently issueable due to the Share Entitlement Limitations, the Holder shall have no right to the Unissued Share Entitlement, including, without limitation, no right to vote such Unissued Share Entitlement in any matter whatsoever, no right to influence management, no right to possession, none of the benefits of ownership, or enjoyment, including, without limitation, no right to sell or to otherwise dispose of and no right to control or to influence the Company, its operations, directly or indirectly, until such shares comprising such Unissued Share Entitlement are received by the Holder, consistent with and in accordance with, the provisions of this blocker provision. For the purposes of this provision, as set forth in the immediately preceding sentence, beneficial ownership shall be determined in accordance with Section 16 of the Securities Exchange Act of 1934, as amended.

(b)     Interest on any unpaid principal balance of this Note shall be paid at the rate of 8% per annum.

(c)     During the first six months this Note is in effect, the Company may redeem this Note by paying to the Holder, principal plus interest, in whole or in part, with no prepayment penalty.

(d)     Upon (i) a transfer of all or substantially all of the assets of the Company to any person in a single transaction or series of related transactions, (ii) a reclassification, capital reorganization or other change or exchange of outstanding shares of the Common Stock, other than a forward or reverse stock split or stock dividend, or (iii) any consolidation or merger of the Company with or into another person or entity in which the Company is not the surviving entity (other than a merger which is effected solely to change the jurisdiction of incorporation of the Company and results in a reclassification, conversion or exchange of outstanding shares of Common Stock solely into shares of Common Stock) (each of items (i), (ii) and (iii) being referred to as a "Sale Event"), then, in each case, the Company shall, upon request of the Holder, redeem this Note in cash for 120% of the principal amount, plus accrued but unpaid interest through the date of redemption, or at the election of the Holder, such Holder may convert the unpaid principal amount of this Note (together with the amount of accrued but unpaid interest) into shares of Common Stock immediately prior to such Sale Event at the Conversion Price.

(e)     In case of any Sale Event (not to include a sale of all or substantially all of the Company's assets) in connection with which this Note is not redeemed or converted, the Company shall cause effective provision to be made so that the Holder of this Note shall have the right thereafter, by converting this Note, to purchase or convert this Note into the kind and number of shares of stock or other securities or property (including cash) receivable upon such reclassification, capital reorganization or other change, consolidation or merger by a holder of the number of shares of Common Stock that could have been purchased upon exercise of the Note and at the same Conversion Price, as defined in this Note, immediately prior to such Sale Event. The foregoing provisions shall similarly apply to successive Sale Events. If the consideration received by the holders of Common Stock is other than cash, the value shall be as determined by the Board of Directors of the Company or successor person or entity acting in good faith.

5. No provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of, and interest on, this Note at the time, place, and rate, and in the form, herein prescribed.

6. The Company hereby expressly waives demand and presentment for payment, notice of non-payment, protest, notice of protest, notice of dishonor, notice of acceleration or intent to accelerate, and diligence in taking any action to collect amounts called for hereunder and shall be directly and primarily liable for the payment of all sums owing and to be owing hereto.

7. The Company agrees to pay all costs and expenses, including reasonable attorneys' fees and expenses, which may be incurred by the Holder in collecting any amount due under this Note.

8. If one or more of the following described "Events of Default" shall occur:

(a) The Company shall default in the payment of principal or interest on this Note or any other note issued to the Holder by the Company; or

(b) Any of the representations or warranties made by the Company herein or in any certificate or financial or other written statements heretofore or hereafter furnished by or on behalf of the Company in connection with the execution and delivery of this Note, or the Securities Purchase Agreement under which this note was issued shall be false or misleading in any respect; or

(c) The Company shall fail to perform or observe, in any respect, any covenant, term, provision, condition, agreement or obligation of the Company under this Note or any other note issued to the Holder; or

(d) The Company shall (1) become insolvent; (2) admit in writing its inability to pay its debts generally as they mature; (3) make an assignment for the benefit of creditors or commence proceedings for its dissolution; (4) apply for or consent to the appointment of a trustee, liquidator or receiver for its or for a substantial part of its property or business; (5) file a petition for bankruptcy relief, consent to the filing of such petition or have filed against it an involuntary petition for bankruptcy relief, all under federal or state laws as applicable; or

(e) A trustee, liquidator or receiver shall be appointed for the Company or for a substantial part of its property or business without its consent and shall not be discharged within sixty (60) days after such appointment; or

(f) Any governmental agency or any court of competent jurisdiction at the instance of any governmental agency shall assume custody or control of the whole or any substantial portion of the properties or assets of the Company; or

(g) Unless previously disclosed in the Company's filings with the Securities and Exchange Commission, one or more money judgments, writs or warrants of attachment, or similar process, in excess of one hundred thousand dollars ($100,000) in the aggregate, shall be

Initials

entered or filed against the Company or any of its properties or other assets and shall remain unpaid, unvacated, unbonded or unstayed for a period of fifteen (15) days or in any event later than five (5) days prior to the date of any proposed sale thereunder.

(h)     The Company shall have defaulted on or breached any term of any other note of similar debt instrument into which the Company has entered and failed to cure such default within the appropriate grace period; or

(i)     The Company shall have its Common Stock delisted from an exchange (including the OTCBB exchange) or, if the Common Stock trades on an exchange, then trading in the Common Stock shall be suspended for more than 10 consecutive days;

(j)     The Company shall not deliver to the Holder the Common Stock pursuant to paragraph 4 herein without restrictive legend within 3 business days of its receipt of a Notice of Conversion; or

(k)     The Company shall not replenish the reserve set forth in Section 12, within 3 business days of the request of the Holder; or

(l)     The Company shall not be "current" in its filings with the Securities and Exchange Commission; or

(m)     The Company shall lose the "bid" price for its stock in a market (including the OTCQB marketplace or other exchange), which remains unavailable for 5 consecutive trading days.

Then, or at any time thereafter, unless cured, and in each and every such case, unless such Event of Default shall have been waived in writing by the Holder (which waiver shall not be deemed to be a waiver of any subsequent default) at the option of the Holder and in the Holder's sole discretion, the Holder may consider this Note immediately due and payable, without presentment, demand, protest or (further) notice of any kind (other than notice of acceleration), all of which are hereby expressly waived, anything herein or in any note or other instruments contained to the contrary notwithstanding, and the Holder may immediately, and without expiration of any period of grace, enforce any and all of the Holder's rights and remedies provided herein or any other rights or remedies afforded by law. Upon an Event of Default, interest shall accrue at a default interest rate of 15% per annum or, if such rate is usurious or not permitted by current law, then at the highest rate of interest permitted by law. The Holder has the right to Convert in the event of default at the Default conversion at a price ("Default Conversion Price") for each share of Common Stock equal to 35% of the average of the two lowest closing prices (a discount of 65%), In the event of a breach of Section 8(k) the penalty shall be $250 per day the shares are not issued beginning on the 4th day after the conversion notice was delivered to the Company.

If the Holder shall commence an action or proceeding to enforce any provisions of this Note, including, without limitation, engaging an attorney, then if the Holder prevails in such action, the Holder shall be reimbursed by the Company for its attorneys' fees and other costs and expenses incurred in the investigation, preparation and prosecution of such action or proceeding.

---

Initials                    $100,000 Convertible Debenture                    Page 5 of 7

9.      In case any provision of this Note is held by a court of competent jurisdiction to be excessive in scope or otherwise invalid or unenforceable, such provision shall be adjusted rather than voided, if possible, so that it is enforceable to the maximum extent possible, and the validity and enforceability of the remaining provisions of this Note will not in any way be affected or impaired thereby.

10.      Neither this Note nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument signed by the Company and the Holder.

11.      The Company will give the Holder direct notice of any corporate actions, including but not limited to name changes, stock splits, recapitalizations etc. This notice shall be given to the Holder as soon as possible under law.

12.      This Note shall be governed by and construed in accordance with the laws of New York applicable to contracts made and wholly to be performed within the State of New York and shall be binding upon the successors and assigns of each party hereto. The Holder and the Company hereby mutually waive trial by jury and consent to exclusive jurisdiction and venue in the courts of the State of New York. This Agreement may be executed in counterparts, and the facsimile transmission of an executed counterpart to this Agreement shall be effective as an original.

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by an officer thereunto duly authorized.

Dated: 5th August, 2016

INDO GLOBAL EXCHANGE(S) PTE, LTD.

By: John O'Shea

Title: Director CEO

## EXHIBIT A

### NOTICE OF CONVERSION

(To be Executed by the Registered Holder in order to Convert the Note)

The undersigned hereby irrevocably elects to convert $_____ of the above Note into _____ Shares of Common Stock of INDO GLOBAL EXCHANGE(S) PTE, LTD. ("Shares") according to the conditions set forth in such Note, as of the date written below.

If Shares are to be issued in the name of a person other than the undersigned, the undersigned will pay all transfer and other taxes and charges payable with respect thereto.

Date of Conversion: _____

Applicable Conversion Price: _____

Signature: _____

[Print Name of Holder and Title of Signer]

Address: _____

_____

SSN or EIN: _____

Shares are to be registered in the following name: _____

Name: _____

Address: _____

Tel: _____

Fax: _____

SSN or EIN: _____

Shares are to be sent or delivered to the following account:

Account Name: _____

Address: _____

# EXHIBIT 3

## AGREEMENT

This Agreement (the "Agreement") is entered into effective July 17, 2017, by and between:

John O'Shea, with its principal offices located at 1333 Sprucewood Deerfield, IL 60015;

Capitol Capital Corporation, 20 Margaret Ave, Lawrence N.Y. 11559;

Robyn Goulding, with her principal offices located at 1333 Sprucewood Deerfield, IL 60015;

Market Cap Concepts, LLC, PO box 2811, Woodstock GA 30188; and

Mark Miller.

### RECITALS:

WHEREAS, John O'Shea had previously entered one or more agreements with Capitol Capital Corporation, each of which are hereby terminated and superseded by this Agreement, including any considerations provided for herein.

WHEREAS, Market Cap Concepts, LLC (MCC) and Mark Miller are each desirous of providing consultancy services to Capitol Capital Corporation and whereas Capitol Capital Corporation is desirous of engaging the services of each, including identifying private companies desirous of being acquired by Indo Global Exchange(s) Pte, Ltd. (the "Company") and/or by Capitol Capital Corporation.

WHEREAS, in August 2016, Capitol Capital Corporation acquired from Dermot Monaghan, a third party, a $52,545 convertible (of which $38,006 was then due and payable), for which the Company issued a convertible promissory note (the "Debenture").

WHEREAS, on or about August 5, 2016, Capitol Capital Corporation advanced $25,000 to Indo Global for a $100,000 note (the "$100,000 Note").

WHEREAS, in accordance with the terms of a certain Debt Settlement Resolution entered into by the parties hereto as of the date hereof, Capitol Capital Corporation has relinquished all rights to the Debenture and to the $100,000 Note, in exchange for 680,000,000 shares (the "Shares") of Indo Global Exchange(s) Pte, Ltd.

WHEREAS, while this Agreement contemplates that Capitol Capital Corporation will pay other parties to this Agreement from income derived from the Shares, the Shares shall belong solely to Capitol Capital Corporation, and no other party shall have any rights or ownership in or to the Shares themselves, including, without limitation, no right to vote such Shares, no control, no right to influence the Company or its management, no right to possession, no right to sell or to otherwise dispose of the Shares.

NOW THEREFORE, in consideration of the mutual covenants and promises herein contained and upon the terms and conditions hereinafter set forth, the parties hereto, intending to be legally bound, agree as follows:

1. The above recitals are incorporated herein by this reference.

2. The net proceeds on the sale of the 680,000,000 shares issued pursuant to the Debt Settlement Resolution shall be divided as follows:

   a. The first $128,102.23 shall be paid 15.4% each, to each of John O'Shea, Howard Salamon, David Goulding and to Randall S. Goulding, 38.57% to Securities Counselors Inc. and 12.5% to each of Mark Miller and Jason Black and thereafter the net sales proceeds shall be paid;

   b. Thereafter, the division shall be as follows: 37.5% to John O'Shea, and 12.5% to each of Howard Salamon, David Goulding, Randall S. Goulding, Mark Miller and Jason Black.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date set forth above.

JOHN O'SHEA:

_____                    Date  07/19/2019
John O'Shea, individually


ROBYN GOULDING:

_____                    Date  7/19/19
Robyn Goulding, individually


CAPITOL CAPITAL CORPORATION:

By:_____                 Date _____
Howard Salamon, CEO


MARK MILLER:

_____                    Date _____


MARKET CAP CONCEPTS LLC:

By:_____                 Date 07/172019
Jason Black, President

1. The above recitals are incorporated herein by this reference.

2. The net proceeds on the sale of the 680,000,000 shares issued pursuant to the Debt Settlement Resolution shall be divided as follows:

    a. The first $128,102.23 shall be paid 15.4% each, to each of John O'Shea, Howard Salamon, David Goulding and to Randall S. Goulding, 38.57% to Securities Counselors Inc. and 12.5% to each of Mark Miller and Jason Black and thereafter the net sales proceeds shall be paid;

    b. Thereafter, the division shall be as follows: 37.5% to John O'Shea, and 12.5% to each of Howard Salamon, David Goulding, Randall S. Goulding, Mark Miller and Jason Black.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date set forth above.

JOHN O'SHEA:

_____    Date_____
John O'Shea, individually

ROBYN GOULDING:

_____    Date_____
Robyn Goulding, individually

CAPITOL CAPITAL CORPORATION:

By:_____    Date_____
Howard Salamon, CEO

MARK MILLER:

_____    Date 07/17/2019

MARKET CAP CONCEPTS LLC:

By: _____    Date 07/172019
Jason Black, President

Page 2 of 2

1. The above recitals are incorporated herein by this reference.

2. The net proceeds on the sale of the 680,000,000 shares issued pursuant to the Debt Settlement Resolution shall be divided as follows:

 a. The first $128,102.23 shall be paid 15.4% each, to each of John O'Shea, Howard Salamon, David Goulding and to Randall S. Goulding, 38.57% to Securities Counselors Inc. and 12.5% to each of Mark Miller and Jason Black and thereafter the net sales proceeds shall be paid;

 b. Thereafter, the division shall be as follows: 37.5% to John O'Shea, and 12.5% to each of Howard Salamon, David Goulding, Randall S. Goulding, Mark Miller and Jason Black.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date set forth above.

JOHN O'SHEA:

_____  Date_____
John O'Shea, individually

ROBYN GOULDING:

_____  Date_____
Robyn Goulding, individually

CAPITOL CAPITAL CORPORATION:

By:_____  Date 7-17-19
Howard Salamon, CEO

MARK MILLER:

_____  Date_____

MARKET CAP CONCEPTS LLC:

By:_____  Date 07/172019
Jason Black, President

# EXHIBIT 4

## Confirmations by Mark Miller

While this firm has represented you and different companies with which you have been involved in the course of our representation, we have become aware of the investigation by the Securities Exchange Commission (the "Investigation").

In addition to the legal services provided in connection with the Investigation, we have pursued a business relationship including the involvement of several different companies in several different initiatives. That relationship has resulted in introductions to third parties, warranting a discussion and analysis concerning your exposure with regard to the Investigation. While I am personally convinced that your activities concerning what has resulted in the Investigation, were legal and that none of the associated assets were proceeds of, or benefits from, illegal activity, it is necessary as part of our due diligence, including to assure us that our conduct is proper, ethical and compliant with our legal obligations. It also serves our protection and your protection that we obtain this confirmation. This will also aid in any dealings with banking institutions, brokers and regulatory authorities, that may ensue.

As a result, please confirm by executing below that the statements contained herein are accurate.

1.      While you are not the subject of any government investigation, you have been asked by the SEC, to provide information and testimony in pursuit of the Investigation. However, neither you nor any of your affiliates have been involved in any illegal promotional activities or conduct that may constitute a "pump and dump."

2.      Following numerous discussions that we have had, you have assured us, including as to the underlying facts, that to the best of your knowledge and belief, all of the press releases and other communications pertaining to such stocks enumerated in the subpoenas served upon you and your affiliates, were accurate and that you have no reason to believe that any were inaccurate. However, as a caveat, you have added that given your limited role and entities in which you did not participate as a control person, you were not involved in, nor have you had any responsibility for, the process of issuing press releases or the dissemination of other company related information, on behalf of any of these public entities, including any of these entities in which you sold shares. Additionally, your representations during the communications between us, were accurate, giving us comfort to convince us that there were no illegal activities, including no "pump and dump."

3.      There is no reason to believe that the government should or would prevail on any potential claims with regard to this Investigation.

4.      Without getting into the specifics of the communications and therefore without waiving attorney-client privilege, you have indicated that other parties subpoenaed, with whom you have a relationship, have reached similar conclusions as to the lack of any rational basis for an adverse position by the SEC. Those parties too, believe in your innocence and that there were no illegal activities on your part, despite the SEC's Investigation.

5.      To the best of your belief, to date, you have fully complied with the SEC subpoenas.

Thank you for your cooperation in this matter.

Mark Miller