UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

David Goulding, Howard
Salamon, Robyn Goulding,
and John O'Shea,

    Plaintiffs,

vs.

Mark Miller,

    Defendant.

Case No:

Judge

## FIRST AMENDED VERIFIED COMPLAINT FOR BREACH OF CONTRACT AND OTHER RELIEF

**NOW COME** Plaintiffs, David Goulding, Howard Salamon, Robyn Goulding and John O'Shea (collectively herein referred to as the "Plaintiffs"), by and through counsel, Fred R Harbecke, complaining of Defendant, Mark Miller (the "Defendant"), stating as follows:

### I. PARTIES

1. David Goulding is an individual residing at 3637 Wilshire Lane Madison WI 53714.

2. Howard Salamon is an individual residing at 20 Margaret Ave, Lawrence N.Y. 11559.

3. Robyn Goulding is an individual residing at 1333 Sprucewood, Deerfield, IL 60015, Lake County Illinois.

4. John O'Shea is an individual residing at 5/99 Queen St, Melbourne, VIC, Australia 3000.

5. Defendant Mark Miller is an individual residing in and doing business 32255 West St Breezy Point, Minnesota 55472.

### II. JURISDICTION AND VENUE

6. Federal jurisdiction exists under 28 U.S.C. Sect 1332.

7. Diversity jurisdiction exists as (a) the amount in controversy or the jurisdictional amount, exceeds $75,000 and (b) there is complete diversity as no Plaintiff shares a state of citizenship with any Defendant. 28 U.S.C. § 1332(a).

8. Defendant submitted to Jurdication in Illinois by executing a Stock Pruchase Agreement on October 14, 2019 that included a Forum Selection Provision proving for suit to be brought in Illioinis.

## III. FACTS RELEVANT TO ALL CLAIMS

9. From its formation in 2012, until on or about June 20, 2020, the principal owners of Capitol Capital Corporation ("CCC") were Howard Salamon, Securities Counselors Inc. ("Counselors"), and David Goulding, and the sole officers and directors were Howard Salamon and David Goulding. In June 2020, Howard Salamon appointed David Goulding as President and resigned.

10. In June 2020, control of CCC, in the form of officership and directorship, but not shares of stock or other equity, was transferred from David Goulding to Defendant Miller.

11. Prior to June 2020, Miller was not legally authorized or legally permitted to act on behalf of CCC.

12. On or about October 10, 2014, Indo Global issued a convertible promissory note to Dermot Monaghan ("Monaghan Note") for a loan to Indo Global. Exhibit 1.

13. On or about August 5, 2016, CCC purchased from Dermot Monaghan the Monaghan Note, funded by the then principals of CCC.

14. On August 5, 2016, upon the payment of $25,000 by CCC to Indo Global, funded by the then principals of CCC, Indo Global issued a $100,000.00 8% Convertible Redeemable Note Due February 5, 2017 (the "$100,000 Note") to CCC. Exhibit 2.

15. As of August 5, 2016, CCC held two notes issued by Indo Global, the Monaghan Note and the $100,000 Note, each of which were convertible into shares of Indo Global common stock.

16. On or about July 17, 2019, CCC exercised its option to convert both the Monagham Note and the $100,000 Note in return for 680,000,000 shares of Indo Global (the "Shares").

17. Each of the Plaintiffs and the Defendant executed an Agreement (the "Agreement," Exhibit 3) which became effective on July 19, 2019 (a typographical error was made on the first page which erroneously stated the year to be 2017).

18. Even though the Defendant had contributed nothing with regard to acquisition of the Shares, the Agreement specified how parties to the Agreement would divide the proceeds of the sales of the Shares.

19. The only reason that the Defendant was to receive anything with regard to the Stock was his oral promise to sell the Shares for the benefit of everyone.

20. The Agreement further provided that:
> WHEREAS, while this Agreement contemplates that Capitol Capital Corporation will pay other parties to this Agreement from income derived from the Shares, the Shares shall belong solely to Capitol Capital Corporation, and no other party shall have any rights or ownership in or to the Shares themselves, including, without limitation, no right to vote such Shares, no control, no right to influence the Company or its management, no right to possession, no right to sell o to otherwise dispose of the Shares.

21. On or about October 14, 2019, Defendant entered into a Stock Purchase Agreement ("SPA," Exhibit 4) with CCC for purchase of 100,750,000 shares of INDO Global common Stock for 102,000.00

22. Paragraph 6.7 of the SPA provides as follows:

> Government Law. This Agrement shall be construed as to both validity and performance and enforced in accordance with and governed by the laws of the State of Illinois, without giving effect to the conflicts of law principles thereof and any wuit shall be brought in the state of Illinois, either in County of Cook or Lake.

23. By email, on March 23, 2022, Justeene Blankenship, Esq., the president of Action Stock Transfer (the "Transfer Agent") a Securities Exchange Commission registered Stock Transfer Agent of Indo Global, informed Randall Goulding, Plaintiffs' attorney, that a total of 872,260,000 shares of Indo Global common stock, were issued to CCC (the 680,000,000 shares referred to as the "Stolen Stock") between October 17, 2019 and December 15, 2019.

24. Prior to March 23, 2022, the issuance of the 872,260,000 shares of Indo Global common stock to CCC, was not known to any person then an officer or director of CCC, including the Plaintiffs herein.

25. On or about March 31, 2022, when confronted with this disclosure by the Stock Transfer Agent, the Defendant admitted to one of the Plaintiffs' attorney, Randall S. Goulding, that he sold the 872,260,000 shares of Indo Global common stock.

26. As confirmed by the Stock Transfer Agent, on or about October 17, 2019, without the knowledge or consent of any officer or director of CCC, including the Plaintiffs hereto, 136,130,000 shares of Indo Global common stock were issued to CCC.

27. The Defendant, without the knowledge or consent of any officer or director of CCC, including the Plaintiffs hereto, sold such 136,130,000 shares.

28. None of the proceeds of sale of such 136,130,000 shares of were paid to any of the Plaintiffs, or to any of the then principals or owners of CCC.

29. As confirmed by the Stock Transfer Agent, again, on or about October 31, 2019, without the knowledge or consent of any officer or director of CCC, including the Plaintiffs hereto, an additional 136,130,000 shares were issued to CCC.

30. The Defendant, without the knowledge or consent of any officer or director of CCC, including the Plaintiffs hereto, such additional 136,130,000 shares were sold.

31. None of the proceeds of sale of such additional 136,130,000 shares were paid to any of the Plaintiffs, or to any of the then principals or owners of CCC.

32. As confirmed by the Stock Transfer Agent, again on or about December 3, 2019, without the knowledge or consent of any of the Plaintiffs hereto, an additional 180,000,000 shares of were issued to CCC.

33. The Defendant, without the knowledge or consent of any officer or director of CCC, including the Plaintiffs hereto, sold such 180,000,000 shares.

34. None of the proceeds of sale of such additional 180,000,000 shares were paid to any of the Plaintiffs, or to any of the then principals or owners of CCC.

35. As confirmed by the Stock Transfer Agent, again on or about December 11, 2019, without the knowledge or consent of any officer or director of CCC, including the Plaintiffs hereto, an additional 210,000,000 shares were issued to CCC.

36. The Defendant, without the knowledge or consent of any officer or director of CCC, including the Plaintiffs, sold such 210,000,000 shares.

37. Finally, as confirmed by the Stock Transfer Agent, on or about December 16, 2019, without the knowledge and consent of any officer or director of CCC, including the Plaintiffs, an additional 210,000,000 shares were issued to CCC.

38. Defendant, without the knowledge or consent of any officer or director of CCC, including the Plaintiffs hereto, sold such 210,000,000 shares.

39. In total, all of the 872,260,000 shares of Indo Global common stock of which 680,000 were the Stolen Stock, were issued to CCC, albeit without the knowledge or consent of any officer or director of CCC, including the Plaintiffs.

40. None of the sales proceeds of such 872,260,000 shares of Indo Global common stock were paid to any of the Plaintiffs.

41. In accordance with the terms of the Agreement, the Defendant was recquired parties were to distribute 75% of the sales proceeds to the Plaintiffs.

42. Once the 680,000.00 shares of Stolen Stock were issued, had they not been sold, CCC and its officers and directors would have been "control persons" and legally required to have been listed in OTC Markets reports as such, in order to be compliant with Securities and Exchange Commission rules and regulations.

43 However, no such disclosures were made by the Defendant, who was the only person, among the parties to this lawsuit, that had knowledge of their issuance.

44. On October 28, 2019, by email, Miller falsely told Randall Goulding of Securities Counselors Inc., that he was unable to sell any of the Indo Global Shares, stating that his broker had concerns over the "Shell Risk Designations and [that she] believes this will be a decline from Pershing [the broker's clearing firm]".

45. On Jan 20, 2020, at 6:29 PM, David Goulding inquired, by email to Miller, whether anything happened on Sale of the shares.

46. In response by email to David Goulding on January 20, 2020, Miller falsely denied selling any of the Stolen Stock, stating that "Nothing further transpired from IGEX".

47. In that same email exchange, on January 20, 2020, Miller told David Goulding that "IGEX ... was a dead end on every aspect."

48. Upon information and belief, contrary to the representations of Miller, the Defendant had sold the Stolen Stock for approximately $830,000.00, based on an average selling price per share, calculated at $0.000954 per share, during the period of time between October 17, 2019 and December 15, 2019, in which such shares were issued by Action Stock Transfer, the stock transfer agent and therefore available for sale.

49. Despite the terms of the Agreement, the Defendant sold the Stolen Stock and did not provide any proceeds to the Plaintiffs.

50. Defendant breached his contractual obligation by failing and refusing to pay 75% of the sales proceeds to the Plaintiffs and failed to pay any amount whatsoever to any of the Plaintiffs.

51. Upon information and belief, Defendant's breach of his contractual obligations has caused damages and losses to Plaintiffs in the amount of approximately $830,000.00.

52. Out of an abundance of caution, in October 2019, knowing that the Securities and Exchange Commission was questioning Miller on a number of matters, prior to the first share issuance of Indo Global common stock into the control of Miller, an attorney for Plaintiffs, requested that Miller execute a statement (the "Confirmations by Defendant Miller"), assuring, among other things, that Miller was not engaged in illegal conduct, despite the Securities and Exchange Commission's inquiry.

53. On October 13, 2019, Miller executed the "Confirmations by Miller." Exhibit 5.

54. However, contradicting the Confirmations by Miller, Miller had previously engaged in a scheme to hijack multiple dormant shell companies and then pump-and-dump their stock shares on the over-the-counter market to unwitting investors. The SEC filed a complaint in

*Securities and Exchange Commission v. Mark A. Miller, et. al.,* No. 21-cv-01445 (D. Minn. June 18, 2021).

(Https://www.sec.gov/litigation/complaints/2021/comp25118.pdf)

### Count 1

### Breach of Contract (Agreement)

**NOW COME** the Plaintiffs, complaining of Defendant for his Breach of the Agreement, stating as follows:

1- 54. Paragraphs 1 - 54 are repeated and realleged as if set forth fully herein.

55. The Agreement is a valid and binding contract.

56. Plaintiffs have fully performed their obligations under the Agreement.

57. Defendant agreed to the terms of the Agreement and agreed to facilitate the sale of the Stolen Stock and to distribute 75% of the sales proceeds from the Stolen Stock to the Plaintiffs.

58. It was CCC's sole right receive issuance of the shares of the Stolen Stock and to sell them.

59. Only the Plaintiffs provided any consideration for the Stolen Stock.

60 Without authority, from October 2019 through the end of 2019, Miller falsely, surreptitiously, and without legal authority, induced the Transfer Agent to issue the Stolen Stock, sold the Stolen Stock and retained all of the proceeds, without remitting any of the proceeds to any of the Plaintiffs.

61. Since the Defendant breached the Agreement, he has not earned the 25% he was to otherwise receive in consideration of fulfilling his contractual obligations.

62. Plaintiffs were injured by Defendant breach.

63. Plaintiffs have been damaged in the amount of approximately $830,000.00.

**WHEREFORE,** Plaintiffs pray for entry of a money judgment in their favor and against Defendant in an amount determined by this Court; for costs; and for such other and further relief as this Honorable Court may deem just.

## COUNT II

### Breach of Contract (SPA)

**NOW COME** the Plaintiffs, complaining of Defendant for his Breach of the Agreement, stating as follows:

1-54. Paragraphs 1 - 54 Count I are repeated and realleged as if set forth fully herein.

55. SPA is a valid and binding contract

56. Plaintiffs have fully performed their obligations under the Agreement

57. The Defendant never paid the Purchase price of $102,000.00 and otherwise failed his obligation under the SPA

58. Plaintiffs were injured by Defendant's breach

59. Plaintiffs have been damaged

60. Plaintiffs were injured by Defendant breach.

61. Plaintiffs have been damaged in the amount of approximately $102,000.00.

**WHEREFORE,** Plaintiffs pray for entry of a money judgment in their favor and against Defendant in an amount determined by this Court; for costs; and for such other and further relief as this Honorable Court may deem just.

### Count III Conversion

**NOW COME** the Plaintiffs, complaining of Defendant's conversion, stating as follows:

1-63. Paragraphs 1 – 63 of Count I are repeated and realleged as if set forth fully herein.

64. Only CCC had a right to issuance and sale of the Stolen Stock.

65. Until 2020, after the sale of all of the Stolen Stock only two of the Plaintiffs, Howard Salamon and David Goulding, had legal control of CCC, as its sole officers and directors.

66. CCC, by and through its officers and directors, including the plaintiffs herein, had an absolute and unconditional right to the immediate possession of the Stolen Stock, once it was issued.

67. The Defendant without the knowledge or consent of Plaintiffs, wrongfully and without authorization directed issuance of the Stolen Stock and assumed control and dominion over the Stolen Stock.

68. The Defendant sold the Stolen Stock and retained all of the proceeds for his own personal benefit.

**WHEREFORE,** Plaintiffs pray for entry of a money judgment in their favor and against Defendants in an amount determined by this Court; for costs; and for such other and further relief as this Honorable Court may deem just.

### Count IV

### Common Law Fraud

**NOW COME** the Plaintiffs, complaining of Defendant of common law fraud, stating as follows:

1- 68. Paragraphs 1 – 68 of Count III are repeated and realleged as if set forth fully herein.

69. On or about November 1, 2021, the SEC charged Miller, and others in a securities fraud company hijacking and Pump-And-Dump Scheme, Litigation Release No. 25253 / November 1, 2021, *Securities and Exchange Commission v. Mark A. Miller, et. al.,* No. 21-cv-01445 (D. Minn. June 18, 2021) alleging, among other things, that "Miller hijacked five of the seven public companies, DIGI, ECMH, BLLB, UITA, and SMEV (the "Hijacked Issuers"), LEAS and BBDA (the "Pumped Companies")".

70. Miller engaged in similar misconduct when he hijacked CCC with the assistance and participation of Market.

71. As part of Defendant's scheme to defraud Plaintiffs, Miller illegally seized control of CCC and executed documents, as its purported officer, in order to enable CCC to deposit the Stolen Stock into a brokerage account or to otherwise sell the Stolen Stock without any of the Plaintiffs knowing, thereby enabling Defendant to retain the sales proceeds without accounting to the Plaintiffs and without paying the Plaintiffs their share of the sales proceeds.

72. In order to perpetrate their fraud, the Defendant made many false statements of material fact, including without limitation, those plead herein.

73. These false statements were known to be false by Defendant when they were made.

74. Defendant intended that these false statements induce Plaintiffs to fail to act to protect their interests in the Stolen Stock.

75. The Plaintiffs reasonably and justifiably relied on and reasonably acted in reliance on these false statements.

76. As a result of Plaintiffs' reasonable and justifiable reliance on the false statements by Defendant, they were damaged in that they were denied the opportunity to share in the sale of the Stolen Stock.

77. The false and deceitful statements and the unethical and illegal conduct by the Defendant as set forth herein, violate fundamental principles of equity, justice and good conscience, and it would be unfair to allow Defendant to not compensate Plaintiffs for their losses proximately caused thereby.

**WHEREFORE,** Plaintiffs pray for entry of a money judgment in their favor and against Defendant in an amount to be determined by this Honorable Court; for punitive damages; for costs; and for such other and further relief as this Honorable Court may deem just:

Dated: December 19, 2022                    Plaintiffs:

                                            /x/Fred R Harbecke

Fred R Harbecke
53 W. Jackson Blvd. Suite 1510
Chicago, IL 60604
312-443-9505
fredrharbecke@sbcglobal.net

STATE OF ILLINOIS)
                      )SS
COUNTY OF COOK)

    Under penalties as the undersigned, certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that she verily believes the same to be true.

*Robyn Goulding*
Robyn Goulding

Sworn and Subscribed before
me this 19th day of December, 2022.

*Martha Y Esparza-Flores*
NOTARY PUBLIC

OFFICIAL SEAL
MARTHA Y ESPARZA-FLORES
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 6/25/2025