UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| David Goulding, Howard Salamon, Robyn Goulding, and John O'Shea<br><br>    Plaintiffs,<br>v.<br><br>Mark Miller,<br><br>    Defendant. | 22 cv 05224 |

**RESPONSE TO DEFENDANT'S MOTION TO**
**DISMISS FIRST AMENDED COMPLAINT**

**NOW COME** the Plaintiffs, by and through their attorney, Fred R. Harbecke, and in response to Defendant's Motion to Dismiss First Amended Complaint (the "Motion"), argue as follows:

### I. THE MOTION

Initially, Plaintiffs note that the Motion alleges that it is brought under Sections 12(b)(1) (lack of subject matter jurisdiction); 12(b)(2) (lack of personal jurisdiction); and 12(b)(6) (failure to state a claim). The Motion, however, does not argue lack of subject matter jurisdiction, which is based upon diversity (28 U.S.C. Sect 1332); and does not argue failure to state a cause. Instead, it only addresses lack of personal jurisdiction and lack of standing.

In the First Amended Complaint ("Complaint"), the Plaintiffs alleged that venue is proper in Illinois, due to a forum selection provision contained in the Stock Purchase Agreement (the "SPA," Exhibit 4 to the Complaint). Defendant argues, however, that the

1

SPA is not a valid and binding contract, because the Plaintiffs' entity CCC did not sign it.

Defendant further argues that while the Plaintiffs may have standing with regard to all Counts other than Count II involving the SPA, they do not have standing with regard to Count II.

## II.  RESPONSE

### A.  LACK OF PERSONAL JURISDICTION.

**1. Standard.**

In Motions for dismissal for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction. (Research Found. v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 782 (7th Cir. 2003).) When the court rules on the motion without a hearing, the plaintiff need only establish a prima facie case of personal jurisdiction. (Id.) The court reads the complaint liberally, in its entirety and with every inference drawn in favor of the plaintiff to determine whether it has done this. (Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co., 440 F.3d 870, 877-78 (7th Cir. 2006).)

**2. Relevant facts alleged in the First Amended Complaint (the "Complaint").**

8.  Defendant submitted to Jurisdiction in Illinois by executing a Stock Purchase Agreement on October 14, 2019 that included a Forum Selection Provision providing for suit to be brought in Illinois.

9. From its formation 2012, until on or about June 20, 2020, the principal owners of Capitol Capital Corporation ("CCC") were Howard Salamon, Securities Counselors Inc. ("Counselor"), and David Goulding, and the sole officers and directors were Howard Salmon and David Goulding. In June 2020, Howard Salmon appointed David Goulding as President and resigned.

2

17. Each of the Plaintiffs and the Defendant executed an Agreement (the "Agreement," Exhibit 3 [to the Complaint]) which became effective on July 19, 2019 (a typographical error was made on the first page which erroneously stated the year to be 2017).

21. On or about October 14, 2019, Defendant entered into a Stock Purchase Agreement ("SPA," Exhibit 4 [too the Complaint]) with CCC for purchase of 100,750,000 shares of INDO Global common Stock for 102,000.00.

22. Paragraph 6.7 of the SPA provides as follows:

Government Law. This Agreement shall be construed as to both validity and performance and enforced in accordance with and governed by the laws of the State of Illinois, without giving effect to the conflicts of law principles thereof and any suit shall be brought in the state of Illinois, either in County of Cook or Lake.

23. By email, on March 23, 2022, Justeene Blankenship, Esq., the president of Action Stock Transfer (the "Transfer Agent") a Securities Exchange Commission registered Stock Transfer Agent of Indo Global, informed Randall Goulding, Plaintiffs' attorney, that a total of 872,260,000 shares of Indo Global common stock, were issued to CCC (the 680,000,000 shares referred to as the "Stolen Stock") between October 17, 2019 and December 15, 2019.

25. On or about March 31, 2022, when confronted with this disclosure by the Stock Transfer Agent, the Defendant admitted to one of the Plaintiffs' attorney, Randall S. Goulding, that he sold the 872,260,000 shares of Indo Global common stock.

56. Plaintiffs have fully performed their obligations under the Agreement [sic the SPA].

**3. Waiver of personal jurisdiction - Forum Selection Clause.**

While the general principals regarding personal jurisdiction outlined by the Defendant are correct, courts have long held that personal jurisdiction is a waivable right. In <u>Burger King Corp v. Rudzewicz</u>, 471 U.S. 462, 472 n.14 (1985), the Supreme Court noted that there are a "'variety of legal arrangements' by which a litigant may give 'express or implied consent to the personal jurisdiction of the court.'" These include forum selection provisions which are agreed to in advance by the parties, where such

3

provisions are freely negotiated and are not unreasonable or unjust. Id.

Illinois courts have further found that forum selection clauses have been held to apply not merely to contract claims involving the terms of the contract in which the clause appears, but also to other claims that are otherwise connected to the contract, such as tort claims arising from the contract. (Solargenix Energy, LLC v. Acciona, S.A, 2014 IL App(1st) 123403, Par 34, citing Hugel v. Corp. of Lloyd's, 999 F.2d 206, 209 (7th Cir. 1993); and Omron Healthcare, Inc. v. Maclaren Exports Ltd., 28 F.3d 600, 603 (7th Cir. 1994) (all disputes the resolution of which arguably depended on the construction of an agreement' arise out of that agreement for purposes of [a forum selection clause]'").

In Solargenix, the Plaintiff entered into Joint Venture Agreements ("JVA"), Cooperation Agreements ("CA"), and various other agreements, with a subsidiary of the Spanish corporate defendant (the "Spanish Defendant"). The CA contained a choice of law and forum selection provision. The Spanish Defendant was not a signatory to the JVA or the CA, and in a motion to dismiss pursuant to 735 ILCS 5/2-301(a), it argued that such provision was not binding on it.

The Circuit Court, however, found that personal jurisdiction could be established, because the Spanish Defendant was "closely related to the dispute," and "it was foreseeable that they would be bound by the selection clause." (Solargenix at Par 32.) The Appellate Court agreed, holding that although the Spanish Defendant

4

was not a signatory to the CA, it could nonetheless be bound by the forum selection clause, because it was "closely related" to the dispute such that it became "foreseeable" that it would be bound. (Solargenix at Par 36.)

> The touchstone...is that a court may exercise personal jurisdiction over a defendant by enforcing a forum selection clause against it, even though it was not a signatory to the contract containing the clause, where it was closely related to the dispute such that it became foreseeable that the nonsignatory would be bound...**A nonsignatory impliedly consents to the forum selection clause via its connections with the dispute, the parties, and the contract or contracts at issue.** (Solargenix at Par 42.)

In the case at bar, the Plaintiffs have alleged that the Defendant breached the SPA. Here the parties to the SPA had freely negotiated the forum selection provision. Further, the provision was not unreasonable or unjust, in that each party was a resident of a different jurisdiction, and at least one of them, Counselors, which owned an interest in CCC, was an Illinois entity (See Exhibit A, attached to this Response) an attorney for which drafted the SPA. (Affidavit, Exhibit A-1) Therefore, the Defendant expressly agreed with the forum selection provision; and Defendant waived his right to contest Illinois jurisdiction.

4. **Waiver extends to other claims that are connected to the contract.** In addition to Count II for breach of the SPA, Plaintiffs have alleged: Breach of Contract (Agreement") (Count I); Conversion (Count III); and Common Law Fraud (Count IV). The facts underlying these Counts, arise, in part, from Defendant's exercise of ownership and control over the shares that were the subject of the SPA.

As Illinois courts have held, waiver of jurisdiction by forum

selection provisions is not limited to contract claims involving the terms of the contract in which the clause appears, but also to other claims that are otherwise connected to the contract, such as tort claims arising from the contract. (Solargenix Energy, LLC, 2014 IL App(1st) 23403, Par 34, citing Omron Healthcare, Inc., 28 F.3d 600, 603 (all disputes the resolution of which arguably depended on the construction of an agreement' arise out of that agreement for purposes of [a forum selection clause]'").

Therefore, since the forum selection provisions apply to the Defendant, he has also waived his right to contest Illinois jurisdiction with regard to these Counts.

**5. If Defendant's Exhibit 5 (Wyoming Articles) is to be believed, CCC's signature is not necessary.**

In his motion to dismiss, the Defendant has argued that the SPA was invalid, because it had not been executed by CCC, which was a condition precedent to its formation.

Defendant, however, has also asserted that:

> 6. On October 6, 2019, Mark Miller reinstated CCC as a Wyoming corporation. Pursuant to the Wyoming corporate filing, Mar Miller was named CEO and Chairman of CCC (See attached Exhibit 5).

This was before the SPA was signed by Defendant on October 14, 2019.

Therefore, when Defendant signed the SPA as the buyer he also represented the seller, and an additional signature was unnecessary.

**6. Alternatively, performance under the SPA excused the lack of seller's signature on the SPA.**

6

Plaintiffs alternatively respond that CCC's performance under the SPA was complete when Defendant obtained possession and control over 166,750,000 shares of Indo Global stock.[1]

Plaintiffs have alleged that CCC was entitled to 680,000,000 of such shares (the "Stolen Shares"), the 166,750,000 sold under the SPA being part of that. Plaintiffs have also alleged that the Defendant obtained possession of these shares through his interactions with the Transfer Agent.

Therefore, even though the Defendant improperly obtained such shares, CCC's performance was complete when the Defendant obtained dominion and control over them.

Plaintiffs rely upon the Restatement (Second) of Contracts, Sect. 246 which provides the following:

Effect of Acceptance as Excusing the Non-Occurrence of a Condition.

>      (1) Except as stated in Subsection (2), an obligor's acceptance or his retention for an unreasonable time of the obligee's performance, with knowledge of or reason to know of the non-occurrence of a condition of the obligor's duty, operates as a promise to perform in spite of the non-occurrence under the rules stated in §84.
>
>      (2) If at the time of its acceptance or retention the obligee's performance involves such attachment to the obligor's property that removal would cause material loss, the obligor's acceptance or retention of that performance operates as a promise to perform in spite of the non-occurrence of the condition, under the rules stated in §84, only if the obligor with knowledge of or reason to know of the defects manifests assent to the performance.

---

[1] As indicated in the Motion, Defendant apparently did this by forming a new entity in Wyoming having the same name, and then convincing the Transfer Agent that he was the owner of CCC having CCC's authority to have the shares issued to his CCC.

7

This statement of the law was applied in <u>Formulatrix, Inc. V. Rigaku Automation, Inc.</u>, 344 F.Supp.3d 410 (D Mass 2018), where the court held that:

> Where a material breach occurs "before the injured party has fully performed his duties with respect to the expected exchange," the breach operates "as the non-occurrence of a condition of those remaining duties," which "will at least justify the injured party in suspending his performance[.]" Restatement (Second) of Contracts § 243 cmt. a (1981); <u>Ward v. Am. Mut. Liab. Ins. Co.</u>, 15 Mass. App. Ct. 98, 100-01, 443 N.E.2d 1342, 1343-44 (1983) (citing, generally, § 243 ); <u>Prozinski v. Ne. Real Estate Servs., LLC</u>, 59 Mass. App. Ct. 599, 610 n.8, 797 N.E.2d 415, 424 n.8 (2003) (" 'A material failure of performance ... operates as the non-occurrence of a condition.' Restatement (Second) of Contracts § 237 comment a (1981). Nonoccurrence of a condition, in turn, postpones or terminates the promisor's obligation to perform. Id. at § 225."). However, "[i]t is well established that conduct indicating a willingness to continue to honor a contract, despite knowledge that the other party has failed to perform, 'operates as a promise to perform in spite of that non-occurrence.' " <u>AccuSoft Corp. v. Palo</u>, 237 F.3d 31, 55 (1st Cir. 2001) (quoting Restatement (Second) of Contracts § 246 ). (344 F.Supp3d at 429.)

(See also <u>Hartford Fire Ins. Co. V. United States</u>, 254 F.Supp3d 1333 (Ct.Int'l Trade 2017), where the court held that:

> The lack of Hartford's signatures on these bonds does not defeat formation or enforceability. Hartford cannot plausibly argue on the facts in the record that it did not intend to contract on these bonds,53 being that it billed and received premium on them. Def.'s Facts ¶ 21; Pl.'s Resp. Facts ¶ 21. A surety that bills premium signals that it is the surety on the instrument in question. See Restatement of Contracts § 19(1) ("The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act."). Hartford's efforts to avoid its responsibilities under the bonds are defeated by its performance, namely, its acceptance of premiums. See id.§§ 389(2) ("The power of a party to avoid a contract for mistake or misrepresentation is lost if after he knows or has reason to know of the mistake or of the misrepresentation if it is non-fraudulent ... he manifests to the other party his intention to affirm it."), id. cmt. a ("[T]he affirming party is bound as from the outset and the other party continues to be bound."), 246 ("[A]n obligor's acceptance or his retention for an unreasonable time

8

of the obligee's performance, with knowledge of or reason to know of the non-occurrence of a condition of the obligor's duty, operates as a promise to perform in spite of that non-occurrence ...."). (Hartford Fire Ins. Co. v. United States, 254 F.Supp.3d 1333, 1360 (Ct. Int'l Trade 2017).)

Because CCC's performance was complete and Defendant accepted the benefit of the SPA, CCC's failure to execute the SPA has been excused; the SPA is a valid and binding contract; and the Defendant is bound by its forum selection provision.

## B. LACK OF STANDING.

### 1. Standard.

To establish standing, a plaintiff must allege an injury in fact that is traceable to the defendant's conduct and redressable by a favorable judicial decision. (Casillas v. Madison Ave. Assocs., 926 F.3d 329, 333 (7th Cir. 2019).) In other words, the plaintiff must adequately plead that he or she has suffered: (1) an injury-in-fact that is (2) fairly traceable to the harm committed by the defendant and (3) which the federal judicial system is likely able to redress. (Lujan v. Defs. of Wildlife, 504 U.S. 555, 56061 (1992).) (See also Silha v. ACT, Inc., 807 F.3d 169, 173 (7th Cir. 2015) (citing Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000)).

### 2. Relevant facts alleged in the Complaint.

9. From its formation in 2012, until on or about June 20, 2020, the principal owners of Capitol Capital Corporation ("CCC") were Howard Salamon, Securities Counselors Inc. ("Counselors"), and David Goulding, and the sole officers and directors were Howard Salamon and David Goulding. In June 2020, Howard Salamon appointed David Goulding as President and resigned.

10. In June 2020, control of CCC, in the form of officership and directorship, but not shares of stock or other equity, was transferred from David Goulding to Defendant Miller.

9

11. Prior to June 2020, Miller was not legally authorized or legally permitted to act on behalf of CCC.

17. Each of the Plaintiffs and the Defendant executed an Agreement (the "Agreement," Exhibit 3 [to the Complaint]) which became effective on July 19, 2019 (a typographical error was made on the first page which erroneously stated the year to be 2017).

20. The Agreement further provided that:
WHEREAS, while this Agreement contemplates that Capitol Capital Corporation will pay other parties to this Agreement from income derived from the Shares, the Shares shall belong solely to Capitol Capital Corporation, and no other party shall have any rights or ownership in or to the Shares themselves, including, without limitation, no right to vote such Shares, no control, no right to influence the Company or its management, no right to possession, no right to sell or to otherwise dispose of the Shares.

21. On or about October 14, 2019, Defendant entered into a Stock Purchase Agreement ("SPA," Exhibit 4 [to the Complaint]) with CCC for purchase of 100,750,000 shares of INDO Global common Stock for 102,000.00.

24. Prior to March 23, 2022, the issuance of the 872,260,000 shares of Indo Global common stock to CCC, was not known to any person then an officer or director of CCC, including the Plaintiffs herein.

46. In response by email to David Goulding on January 20, 2020, Miller falsely denied selling any of the Stolen Stock, stating that "Nothing further transpired from IGEX".

47. In that same email exchange, on January 20, 2020, Miller told David Goulding that "IGEX ... was a dead end on every aspect."

**3. Relevant facts alleged in the Motion.**

5. On August 14, 2019, CCC and Mark Miller entered into a Stock Purchase Agreement (See attached Exhibit 4 [to the Motion]) for CCC to sell 166,750,000 shares of CCC to Mark Miller for the purchase price of $102,000. The deal was not consummated. No shares passed Mark Miller an no money was paid to Mark Miller

6. On October 6, 2019, Mark Miller reinstated CCC as a Wyoming corporation Pursuant to the Wyoming corporate filing, Mark Miller was named CEO and Chairman of CCC (See attached Exhibit 5 [to the Motion]).

7. On November 30, 2019, David Goulding and Randall Goulding resigned from positions that they held at CCC and transferred their stock interest in CCC to Mark Miller (see attached Exhibit 6 [to

the Motion], Colorado Articles of Incorporation, paragraph 11);

**4. New Exhibits attached to this Response.**

B. Wyoming Secretary of State information regarding Capitol Capital Corporation incorporated by Defendant on October 6, 2019, and dissolved on December 26, 2019.

C. Certificate of Incorporation.

D. Articles of Dissolution dated December 11, 2019.

**5. Time line.**

a. Capitol Capital Corporation ("CCC") was administratively dissolved on August 9, 2015 by the Wyoming Secretary of State (Exhibit 1 to the Motion).

b. The Agreement is dated July 17, 2019 (Exhibit 3 to the Complaint).

c. Defendant "reinstated" the Wyoming CCC October 6, 2019 (Exhibit 4 to the Motion, and attached Exhibits B and C).[2]

d. The SPA dated October 14, 2019 (Exhibit 4 to the Complaint).[3]

e. Defendant dissolved the "reinstated" Wyoming CCC December 11, 2019 (see attached Exhibit D, and Exhibit 5 to the Motion).

f. Defendant incorporated the Colorado CCC, with self-serving statements that David Goulding and Randall Goulding had resigned and transferred their shares to him, dated November 20, 2019 (Exhibit 6 to the Motion).[4] Plaintiffs deny the statements

---

[2]This was drafted and filed by the Defendant, showing for the first time that Defendant's contention that he had a one-third interest in CCC and was its CEO and Chariman.

[3]While Defendant's alleged facts suggest that the SPA was dated August 14, 2019, the document itself provides that it was dated October 14, 2019. Apparently, Defendant agreed to purchase the stock after he had "reinstated" CCC, effectively taking control of it.

[4]The document filed by the Defendant (Exhibit 6 to the Motion) was prepared and signed by the Defendant. He has not provided any documents conveying title, or any written resignation. For that matter, there are no conveyance documents

11

contained in this document (see Affidavit, Exhibit A-1).

 g. Email from Defendant denying sale of any of the Stolen Stock dated January 20, 2020.

 h. March 23, 2020 shareholders of CCC first learn of the issuance of 872,260,000 shares of Indo Global to CCC and the sale thereof.

**5. Plaintiffs have alleged an injury-in-fact.**

Defendant has alleged that CCC was administratively dissolved in 2015. Wyoming law provides that:

> 17-19-1421. Procedure for and effect of administrative dissolution.
>
> (c) A corporation administratively dissolved continues its corporate existence but may not carry on any activities except those necessary to wind up and liquidate its affairs under W.S. 17-19-1406...
>
> 17-19-1422. Reinstatement following administrative dissolution.
>
> (a) A corporation administratively dissolved under W.S. 17-19-1421 may apply to the secretary of state for reinstatement within two (2) years after the effective date of dissolution...
>
> 17-19-1406. Effect of dissolution.
>
> (a) A dissolved corporation continues its corporate existence but shall not carry on any activities except those appropriate to wind up and liquidate its affairs, including:
>
>  (iii) Disposing of its properties that will not be distributed in kind;

Therefore, according to Wyoming statutes, while Defendant alleges that he reinstated CCC, he in fact incorporated a new entity that had the same name. The old entity continued in

---

(See Exhibit A-1 attached), and David Goulding did not resign until June 2020.

existence in order to liquidate its assets, which included its right to Indo Global stock.

In the July 17, 2019 Agreement which was signed by Plaintiffs, Defendant, and CCC, the parties agreed upon how proceeds of the sale of 680,000,000 shares of Indo Global stock would be shared. The Agreement gave each Plaintiff, individually, rights to certain percentages of the proceeds of sale of the stock. Accordingly, when any sale was made, Plaintiffs were entitled to be paid a portion of the proceeds. When they were not paid, Plaintiffs suffered an injury-in-fact. This injury was directly traceable to the Defendant, which a federal court is able to address. Therefore, Plaintiffs have standing.

The October 14, 2019 SPA, which was signed by the Defendant, provided for a sale of Indo Global stock to the Defendant. As with all other sales, Plaintiffs were entitled to be paid a portion of the proceeds of the sale to Defendant. When the sale was completed and Defendant sold the shares that he received without paying Plaintiffs, Plaintiffs suffered an injury-in-fact that was directly traceable to the Defendant. Therefore, Plaintiffs have standing with regard to breach of the SPA.

### III. **CONCLUSION.**

For the foregoing reasons, Plaintiffs pray that the Defendant's Motion be denied; that the Court find that venue is proper in Illinois and that Plaintiffs have standing; and for such other and further relief as this Honorable Court may deem just.

13

                                          David Goulding, Howard Salamon, Robyn Goulding, and John O'Shea

                                          /x/Fred R. Harbecke

Fred R. Harbecke  
53 W. Jackson Blvd., Suite 1510  
Chicago, IL 60604  
(312) 443-9505  
Attorney No. 50107  
fredrarhbecke@sbcglobal.net

14