**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | |
|---|---|
| David Goulding, Howard Salamon, Robyn Goulding and John O'Shea | ) |
| | ) Case No. 1:22-cv-05224 |
| Plaintiffs | ) |
| | ) Judge Sharon Johnson Coleman |
| vs. | ) Magistrate Judge Finnegan |
| | ) |
| Mark Miller | ) |
| | ) |
| Defendant | ) |

**DEFENDANT'S REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT**

Now comes the Defendant, Mark Miller, by his attorneys, and replies to Plaintiffs' Response Brief as follows:

## INTRODUCTION

Plaintiffs Amended Complaint ("AC") contains four counts. Defendant seeks summary judgment with respect to all four counts. The first count is for Breach of Contract pertaining to an "Agreement" dated July 17, 2017, attached as Exhibit 1[1]. This contract is unenforceable because it is against Illinois public policy. The second count of the AC for Breach of Contract for the purchase of stock. It fails because there was no performance by the Plaintiffs. The third count of the AC for Conversion fails because the Defendant never stole the stock and retained the proceeds for his own personal benefit. Count IV of the AC is for Common Law Fraud. It fails because Plaintiffs have failed to allege any false statement or representation made by the Defendant that Plaintiffs relied upon which caused damage to the Plaintiffs.

[1] The actual date of the Agreement was July 17, 2019.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); S*ee* Cincinnati Life Ins. Co. v. Beyrer, 722 F.3d 939, 951 (7th Cir. 2013). A court will grant summary judgment "if no reasonable trier of fact could find in favor of the non-moving party." Hoppe v. Lewis Univ., 692 F.3d 833, 838 (7th Cir. 2012)

## LEGAL ARGUMENT

### I. Breach of Contract – Agreement

Defendant asserted in their Motion for Summary Judgment that the Agreement was against Illinois public policy because it would amount to a breach of fiduciary duty of loyalty and good faith, conversion and fraud on the vast majority of CCC's common shareholders by denying all of the CCC shareholders the proceeds of the sale of Indo Global Exchange ("IGEX") stock.

In Plaintiffs' Response Brief to the Motion for Summary Judgment ("Response"), they declare that since Howard Salamon was the CEO of Capitol Capital Corporation ("CCC") at the time the Agreement was entered into, it therefore was legal and binding. Plaintiffs further attempt to counter Defendant's Motion for Summary Judgment by asserting that the business judgment rule ("Rule") allowed the management of CCC to pay out the proceeds of the sale to the Plaintiffs while ignoring the other shareholders of CCC. Both of these suppositions are without merit.

In *Shaper v. Bryan*, 371 Ill. App. 3d 1079, 864 N.E.2d 876 (1st Dist. 2007) an Illinois Appellate Court held that:

> The business judgment rule creates a "presumption that in making a business decision, the directors of a corporation acted on an informed basis, … and in the honest belief that

> the action taken was in the best interests of the company [and its shareholders.]" In re The Walt Disney Co., 907 A.2d at 747, quoting Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984).

The Rule requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest. In quoting the Delaware Supreme Court, the *Shaper* court noted that:

> Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests, …A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest."' Cede III, 634 A.2d at 361, quoting Guth v. Loft, Inc., 23 Del. Ch. 255, 5 A.2d 503, 510 (Del. 1939). *Shaper* at p. 1088.

The *Shaper* court went on to state:

> Essentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally. Cede III, 634 A.2d at 361.
>
> The classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders. In re The Walt Disney Co., 907 A.2d at 751. *Shaper* at p. 1088.

In the case at bar, the facts fit the classic example of self-interest. The Agreement was signed by Howard Salamon as CEO of CCC. Not only was Salamon the CEO of CCC, he owned 3,803,519 shares of CCC from September of 2012 through March 25, 2022 (See attached Exhibit 2). On August 12, 2019, Salamon resigned as director and president of CCC and the position was filled by David Goulding, the son of Randall Goulding (See attached Exhibit 3). Randall Goulding[2] is also the husband

[2] Randall Goulding acted as legal counsel to CCC (See attached Affidavit of Mark Miller).

of Robyn Goulding[3]. Plaintiffs argue that the carve out to pay the individual parties for the sale of the Indo Global shares was determined to be fair by CCC itself, and by its CEO at the time, Salamon, who authorized and signed the Agreement. Salamon's and the Gouldings self-interest in which they profited to the detriment of the other CCC shareholders negates any argument that this was a fair transaction On the contrary, this was a blatant example of self-dealing and bad faith, Therefore, Salamon and the Gouldings breached their fiduciary duties to the other CCC shareholders, rendering the Agreement unenforceable under Illinois public policy.

Plaintiffs assert that the individual Plaintiffs who were the ones who provided the entirety of the funding for the Indo Global notes (which were converted into Indo Global shares). Plaintiffs have provided no evidence of any contribution of funds at any time by them to CCC. Some of the Plaintiffs owned common stock shares in CCC. There is no dispute that the shares of IGEX were owned by CCC, not the Plaintiffs. Plaintiffs' First Amended Complaint states that Capitol Capital Corporation .. and no other party shall have any rights to ownership in or to the Shares themselves …" The fact that the individual Plaintiffs may or may not have owned some of the outstanding common stock shares of CCC does not give them the right to take precedence over the other CCC common stock shareholders.

A landmark case in self-interest dealings in securities, directly related to the parties in this case, is SEC v. Nutmeg Group, LLC, 162 F. Supp 3d 754 (N.D. of Ill. 2016) In *Nutmeg,*, David Goulding ("David") and Randall Goulding ("Randell" ) were named defendants and Howard Salamon was named as a Relief Defendant. Nutmeg, founded in 2003 by Randall Goulding,[4] was an investment advisory firm that

[3] CCC's shareholder list does not include John O'Shea, Robin Goulding, David Goulding, or Jason Black as common stockholders in CCC at the time of the Agreement. Plaintiffs are correct in their assertion that Howard Salamon never transferred his common stock interests to Defendant Mark Miller and that Mark Miller did not own any CCC common stock when the IGEX stock was sold by CCC to Tiger Trout Capital. (See affidavit of Mark Miller).

[4] Randall Goulding has served time in prison for mail fraud and tax fraud. See United States v. Goulding, 26 F.3d 656 (7th Cir. 1994). Both state and federal judges have found that he engaged in other shady dealings. See, e.g., Goulding v. United States, 957 F.2d 1420 (7th Cir. 1992).

worked with unregistered investment pools. Nutmet had fifteen advisory clients — which will be referred to collectively as "the Funds". Funds' clients (the "Investors") invested money with the Funds, which would then purchase securities in small companies. The Funds would acquire these securities through private investments in public equity ("PIPE") transactions. The issuing company would then file a registration statement with the SEC, allowing the private investor to sell the shares to the public. The Funds mostly used PIPE investments to acquire rights to convertible equity, convertible debt, and warrants.

Nutmeg was the investment adviser for all of the fifteen funds. It also was a general partner in thirteen funds. In fulfilling its duties as an investment adviser, Nutmeg directed the Funds' strategy and monitored their investments.

Relief Defendants were Randall Goulding's family and friends, and companies owned by them. Nutmeg compensated Relief Defendants for their involvement in the asset transfers. Relief Defendants gained legal title to the Funds' assets in their own names.

Although Relief Defendants received legal title, Randall continued to play a significant role in determining what happened to the assets. He instructed Relief Defendants when to receive the Funds' asset transfers and how to invest them. He decided which companies to invest in, determined how much to invest, negotiated the terms of the investments, and prepared the documentation for the investments. In fact, Relief Defendants never picked investments. The only interest that the Funds retained was a contractual right to the proceeds from the eventual sale of the securities that Relief Defendants purchased with the transferred assets.

Eventually the asset transfers, which took place over a number of years, stopped. The retitling of transferred assets was not completed until sometime after the SEC discovered that Relief Defendants had not transferred back to the respective funds all of the assets that Relief Defendants had received.

The Funds' and Nutmeg's money and investments were commingled at some point in time, making it more difficult to track the Funds' money, redemptions, and expenses. Adding to this difficulty was that required books and records were not kept by the Funds, including general or auxiliary ledgers, trial balances, income and expense statements, and supporting financial documentation.

The Court disagreed with the Defendants' contention that the transfers were not material because the Funds still retained the contract right to sale proceeds. The Court stated that Relief Defendants held legal title to the very securities that the Funds' should have owned for the Investors. The Investors only retained a contractual right to the proceeds received when Relief Defendants sold those securities. These are completely different assets. Perhaps most importantly, the transformation exposed the Investors to a host of new risks. Essentially, Relief Defendants, as the legal owners, could generate cash for themselves by selling the assets. Therefore, their decisions could be driven by self-interest rather than the Investors' best interests. Moreover, Randall may have had an incentive to transfer assets to Relief Defendants. The more assets Randall Goulding transferred to Relief Defendants the more assets they could sell, meaning the more fees Relief Defendants (who were Randall's family and friends) would collect. Because the payments created potential conflicts of interest, they were not in the Investors' best interests. For the same reason, they were material facts that should have been disclosed.

The facts in the *Nutmeg* case is similar to the facts asserted by the Plaintiffs in the case at bar. Plaintiffs, who are the family and friends of Randall Goulding, assert that they should have received the profits from the sale of stock owned by CCC, instead of the corporation receiving profits that belonged to CCC.

Summary Judgment should be granted to Defendant as to Count I because the contract that Plaintiffs assert is against Illinois public policy, placing the interests of some of the common shareholders of CCC ahead of all of the shareholders of CCC.

**II. Count II Breach of Contract**

Plaintiffs allege that Mark Miller breached the Stock Purchase Agreement ("SPA") (See attached Exhibit 4) because Plaintiffs fully performed their obligations under the contract and Miller did not pay CCC the purchase price of $102,000 for 100,750,000 shares of IGEX. It is true that Miller never paid the $120,000; However, he never received any shares of IGEX from CCC pursuant to the SPA agreement (See Affidavit of Mark Miller). Neither party fulfilled the terms of the SPA agreement.

It is hornbook law that a Plaintiff's failure to perform its obligation under a contract precludes it from enforcing the contract's provisions. *Zemco Manufacturing, Inc. v. Navistar International Transportation Corp.*, 270 F.3d 1117, 1123 (7th Cir. 2001). Therefore, Summary Judgment should be granted to Defendant as to Count II.

**III. Count III Conversion**

Plaintiffs allege that Mark Miller sold the 680,000,000[5] shares of IGEX stock at issue in this case and retained all of the proceeds for his own personal use. In fact, the opposite is true. Defendant has produced an American National Bank statement dated 12/31/2019 that clearly indicates that $120,825 was deposited into CCC's account relating to the Tiger Trout, LLC transaction. (See attached Exhibit 5). Mark Miller never received any of the funds from Tiger Trout (See Affidavit of Mark Miller). The funds went to CCC's operating bank account (See Affidavit of Mark Miller). The specifics of these transaction was confirmed by Alan Masley, who is the 100% owner, president and managing member of Tiger Trout. (See attached Exhibit 6, deposition transcript of Alan Masley, page 8, lines 10-20). Mr. Masley confirmed that Tiger Trout purchased 662,260,000 shares of IGEX from CCC (See attached Exhibit 5, Masley deposition, page 10, line 3 to page 11, line 4) on certain dates and number of shares in November and December of 2019. The November and December dates and number of shares were

[5] The correct number of shares of IGEX stock at issue is 662,260,000, not 680,000,000. Plaintiffs' own figures in their Amended Complaint, as well as those used by third party entities, add up to 662, 260,000.

also confirmed by Justeene Blankenship (See attached Exhibit 7). Masley also confirmed the amounts that he paid for each transaction (Masley deposition page 13, line 24 to page 14, line9).[6]

Mark Miller never personally received any payment from Tiger Trout. (Masley Deposition, page 17, line 24 – page 18, line 1). Plaintiffs have not presented any evidence to indicate that Defendant personally received any of the proceeds of the IGEX sale of stock that would contradict Masley's testimony, CCC's bank operating statement or Defendant's affidavit. Judgment should be granted to Defendant as to Count III.

**IV. Count IV – Common Law Fraud**

Mark Miller asserts that he was told by Randall Goulding and David Goulding that they were no longer interested in ownership and control of CCC because of the *Nutmeg* proceedings. (See affidavit of Mark Miller). Plaintiffs allege that Miller committed fraud to seize the proceeds of the IGEX stock that should have been theirs.

The elements of common-law fraud in Illinois are (1) a false statement of material fact by the defendant, (2) who knew that the statement was false (3) and intended to induce the plaintiff to act in reliance upon the statement, (4) the plaintiff reasonably relied upon the truth of the statement, and (5) the plaintiff suffered damage as a result of action in reliance upon the statement. Feis Equities, LLC v. Sompo International Holdings, Ltd., 2020 IL App (1st) 191072, ¶ 51. It is well established that fraud-based claims demand a higher standard when it comes to pleadings, as there must be specific allegations of facts to support the claim. Merrilees v. Merrilees, 2013 IL App (1st) 121897, ¶ 15, Castlerigg Master Investments, Ltd. v. Abbvie, Inc., 2021 IL App (1st) 200527, 191 N.E.3d 121

[6] Masley testified that Tiger Trout paid $135,670 for the IGEX stock in November and December of 2019. Miller believes that the broker of the transactions received a 10% commission of $13,567. This would have left a balance to CCC of $122,103 less fees associated with the transactions.

Plaintiffs have failed to meet the high standard to adequately plead fraud. In paragraph 71 of the AC, Plaintiffs pled that Defendant perpetrated acts without their knowledge. If Plaintiffs were unaware that the Defendant was allegedly usurping control of CCC without their knowledge, then they could not have relied on statements or representations by Defendant Miller. Plaintiffs fail to allege how they relied upon any representation by Defendant to their detriment. In paragraph 72 of the AC, the Plaintiffs merely state "In order to perpetrate their fraud, the Defendant made many false statements of material fact, including without limitation, those pled herein." The allegation of fraud is without any specificity. The AC fails to set forth which statements in the AC pertain to fraud, when the alleged fraud occurred, or who participated in the fraud. Plaintiffs' Response to Defendant's Motion for Summary Judgment adds nothing to their insufficient pleadings. As set forth above, the standard for granting summary judgment is that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Since the Plaintiffs' did not rely on statements or representations by Miller, then Defendant is entitled to summary judgment.

If the Plaintiffs are alleging that Miller committed fraud by moving the corporation registration from Wyoming to Colorado without informing them, then the elements for fraudulent concealment are applicable. They are:

> To prove a fraudulent concealment claim, a plaintiff must prove: "(1) concealment of a material fact, (2) intent to induce a false belief where there exists a duty to speak, (3) that the other party could not have discovered the truth through reasonable inquiry and relied upon the silence as an indication that the concealed fact did not exist, (4) that [*369] the other party would have acted differently had it known of the concealed information, and (5) that its reliance resulted in its injury." Vandenberg v. Brunswick Corp., 2017 IL App (1st) 170181, ¶ 31, 418 Ill. Dec. 559, 90 N.E.3d 1048.

Plaintiffs' AC does not sufficiently plead the elements of fraudulent concealment. The AC is devoid of facts to meet the heightened pleading requirements of the second element of fraudulent concealment. Miller was acting as the corporate director and officer of CCC. He had been given that authority by the

reincorporation of CCC in Wyoming, a document drafted by Randall Goulding, the corporate attorney for CCC. (See attached Exhibit 8).

The third required element to properly plead fraudulent concealment was not met in this case. If David Goulding was still acting as an officer and director of CCC when the transfer was made from Wyoming to Colorado, he and the other Plaintiffs should have noticed that filings with the State of Wyoming ceased to exist. This was easily discoverable by a search of the Secretary of State's office for Wyoming. Plaintiffs failed to plead that they were unable to discover that the corporation was no longer registered in Wyoming. Because Plaintiffs have failed to adequately plead fraud or fraudulent concealment, and have presented no facts to support fraud or fraudulent concealment, Judgment should be granted to Defendant as to Count IV.

**CONCLUSION**

Wherefore, for all of the above reasons, Defendant moves for summary judgment in his favor on all counts of the Amended Complaint and for fees and costs associated with defending the claims of the Plaintiffs.

Respectfully submitted,

*Thomas F. Burke*

Thomas F. Burke
Johnson & Bell, Ltd.
33 W. Monroe Street
27th Floor
Chicago, IL 60603
burket@jbltd.com

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

David Goulding, Howard Salamon, Robin Goulding)
and John O'Shea )
)
Plaintiffs ) Case No. 1:22-cv-05224
)
vs. ) Judge Sharon Johnson Coleman
) Magistrate Judge Finnegan
Mark Miller )
)
Defendant )

**AFFIDAVIT OF MARK MILLER**

I, Mark Miller, being first duly sworn on oath state that if called to testify in this matter, I would competently testify to the following facts based on personal knowledge, information, and belief, as follows:

1. I did not own any common shares of Capitol Capital Corporation ("CCC") when CCC sold its shares of Indo Global Exchange ("IGEX") stock in November and December of 2019 or at any time thereafter.
2. Randall Goulding acted as legal counsel to CCC from its inception in 2012.
3. Randall Goulding is the husband of Robin Goulding and the father of David Goulding.
4. I never paid CCC the purchase price of $102,000 for 100,750,000 shares of IGEX and I never received any shares of IGEX from CCC pursuant to the SPA agreement.
5. CCC received $120,825 from the sale of IGEX stock to Tiger Trout, LLC in November and December of 2019. The $120,825 was deposited into CCC's operating account.
6. Upon information and belief, the broker of the IGEX stock sales from CCC to Tiger Trout took a 10% fee for brokering the transactions.
7. I never personally received any of the $120,825 from Tiger Trout from the sale of IGEX stock in November and December of 2019.
8. I was told by both Randall Goulding and David Goulding prior to November 30th, 2019 that they were no longer interested in participating in the management of CCC because they were involved in the SEC v. Nutmeg, et al, litigation.
9. Randall Goulding prepared the Wyoming reincorporation document that was filed with the State of Wyoming on October 6, 2019. D237

Affiant further sayeth naught.

[signature]
Mark Miller

Dated: 12/30/24

VERIFICATION BY CERTIFICATION

I, Mark Miller, being first duly sworn on oath deposes and states that under penalties as provided by law under 735 ILCS 5/1-109, the undersigned certifies that the statements set forth in this instrument are true and correct except as to matters therein on information and belief and as to such matters, the undersigned certifies that he believes the same to be true.

Mark Miller

Dated: 12/30/24