

**BC**

**FILED**
4/14/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**EE**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| David Goulding, Howard Salamon, | ) | |
| Robyn Goulding, and | ) | |
| John O'Shea., | ) | Case No. 1:22-cv-05224 |
| Plaintiffs, | ) | |
| v. | ) | Judge Sharon Johnson Coleman |
| | ) | Magistrate Judge Laura K. McNally |
| Mark Miller, | ) | |
| Defendant. | ) | |

## Motion to Reconsider Ruling on
## PLAINTIFFS' MOTIONS IN LIMINE

COME NOW, Plaintiffs David Goulding, Howard Salamon, Robyn Goulding, and

John O'Shea, each appearing pro se, pursuant to the Federal Rules of Evidence and

the Federal Rules of Civil Procedure, and hereby respectfully move this Court to

reconsider the denial of the following relief:

1. To admit into evidence the criminal conviction and guilty plea of Defendant

   Mark Miller in <u>United States Securities and Exchange Commission v. Mark

   A. Miller</u>, Case No. 21-CV-01445 (DSD/ECW), to demonstrate a pattern of

   similar misconduct relevant to the civil claims in this case.

2. To permit, to the extent necessary, remote testimony via Zoom for witnesses

   John O'Shea (residing in Australia) at trial in Chicago.

In support of these motions, Plaintiffs state as follows:

**Motion I: To Admit Evidence of Mark Miller's Criminal Conviction and
Guilty Plea - Plaintiffs previously provided the incorrect citation,
furnishing the SEC civil complaint (SEC Final Judgment entered on or
about August 14, 2025, enjoining Miller from violating Section 17(a) of the
Securities Act, including prohibitions on untrue statements of material
fact and material omissions in the offer or sale of securities) instead of the**

1

criminal complaint (*United States v. Miller, et al,* U.S. District of Minnesota (DMN) 0:21-cr-00142-DSD-ECW (2021)) in which Mark Miller pled guilty.

- **Facts**

  - Defendant's wrongful conduct includes material omissions with reasonable reliance by Plaintiffs, similar to Miller's fraudulent schemes for which he pled guilty to 18:371, 15:78j(b) and 78ff and 17 C.F.R. Section 240.10b-5 CONSPIRACY TO COMMIT SECURITIES FRAUD (1).

  - The Disposition of the criminal matter was Custody of the BOP for 12 months and 1 day; 2 years supervised release. *United States v. Miller, et al,* U.S. District of Minnesota (DMN) 0:21-cr-00142-DSD-ECW (2021).

  - This conduct, hijacking public entities, making false filings to solidify control over these entities is exactly what was done by Mark Miller in this case – in this case, hijacking Capitol Capital Corporation, which was the owner of the subject IGEX shares, and thus an integral part of Mark Miller's scheme in this case.

  - Federal Rule of Evidence 404(b)(2) permits the use of Mark Miller's conduct for which he was convicted and sentenced to one year imprisonment as it establishes motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, and lack of accident. *CDX Liquidating Trust v. Venrock Assocs.*, 411 B.R. 591 (2009). This evidence is admissible given the fulfillment of a four-part test established

2

by the Seventh Circuit: (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the act charged; (2) the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a finding that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice, as required under Rule 403. *Petrovic v. City of Chicago*, 2008 U.S. Dist. LEXIS 22463 (2008); *Johnstone v. Wabick,* 220 F. Supp. 2d 899 (2002).

- **Facts: Plaintiffs allege, similar to his conduct enumerated in *UNITED STATES v. Miller, et al,* U.S. District of Minnesota (DMN) 0:21-cr-00142-DSD-ECW (2021*)*, Miller filed Articles of Incorporation on December 11, 2019 containing false statements, including concerning resignations, transfer of ownership, sole director/CEO status, shareholder approval, and Miller's shareholdings.**

- **Facts: Plaintiffs allege, similar to his conduct enumerated in *UNITED STATES v. Miller, et al,* U.S. District of Minnesota (DMN) 0:21-cr-00142-DSD-ECW (2021), that Miller used the false filing to open at least one bank account with American National Bank in Minnesota.**

- **Facts: Plaintiffs allege that, similar to his conduct enumerated in *UNITED STATES v. Miller, et al,* U.S. District of Minnesota (DMN)**

**0:21-cr-00142-DSD-ECW (2021), in early June 2020, Miller urged that CCC be a Colorado corporation and recommended management be handed to him; on June 19, 2020 David Goulding appointed Miller to the CCC board, without granting ownership or shares.**

- **Facts: On October 14, 2021, Miller pled guilty to a pump-and-dump securities fraud scheme and was sentenced to a prison sentence of one year and one day. This scam, which ran from 2017 through 2019, and involved the fraudulent takeovers of at least four publicly traded companies was a scheme to hijack dormant shell companies and then pump-and-dump their stock shares on the over-the-counter market to unwitting investors. *United States v. Miller, et al,* U.S. District of Minnesota (DMN) 0:21-cr-00142-DSD-ECW (2021). Mark Miller's conduct as enumerated therein, was very similar, in many significant respects, to his scheme as enumerated in this particular case.**

  **Background of the Civil Case.** Plaintiffs bring this civil action against Defendant Mark Miller alleging breach of contract, conversion, fraud, misrepresentation, breach of fiduciary duty, and unjust enrichment arising from Miller's unauthorized takeover of Capitol Capital Corporation (CCC), his misappropriation of Indo Global shares owned by CCC, and his diversion of the proceeds from the sale of those shares.

1. **Formation and Ownership of CCC.** From its formation in 2012 until June 20, 2020, the principal owners of CCC were Howard Salamon, Securities

4

Counselors, Inc., and David Goulding. The sole officers and directors were Howard Salamon and David Goulding. The individual Plaintiffs collectively owned approximately seventy-six percent of the outstanding shares of CCC.

2. **Acquisition of Indo Global Shares.** On or about October 10, 2014, Indo Global issued a convertible promissory note to Dermot Monaghan. On or about August 5, 2016, CCC purchased the Monaghan Note from Dermot Monaghan. On the same date, CCC advanced twenty-five thousand dollars to Indo Global in exchange for a one-hundred-thousand-dollar, eight percent Convertible Redeemable Note. On or about July 17, 2019, CCC exercised its option to convert both notes in return for six hundred eighty million shares of Indo Global common stock.

3. **Agreement for Sale of Indo Global Shares.** On July 19, 2019, the parties entered into an agreement whereby Mark Miller and Market Cap Concepts LLC were each to receive twelve and one-half percent of the proceeds from the sale of the Indo Global shares for their efforts in facilitating the sale. The agreement specifically provided that the shares belonged solely to CCC, and no other party had any rights or ownership in the shares.

4. **Miller's Unauthorized Actions.** Unbeknownst to Plaintiffs, on October 6, 2019, without any authority, Mark Miller filed Articles of Incorporation with the Wyoming Secretary of State falsely representing that Howard Salamon had appointed Mark Miller as Director and Chairman of the Board of CCC and had transferred three million eight hundred thousand shares of common stock to Mark Miller. At no time did Howard Salamon ever appoint Mark Miller to any position or transfer any shares to him.

5. **Re-domestication to Colorado.** On December 11, 2019, without any authority, Mark Miller re-incorporated CCC from Wyoming to Colorado. The Colorado Articles of Incorporation falsely stated that the re-domestication was pursuant to a unanimous decision of the Board of Directors. Mark Miller falsely signed the document as President, Director, and Chairman of CCC and as holder of eleven million four hundred thousand shares. Mark Miller was not the President, Director, Chairman, or shareholder of CCC at that time.

6. **Sale of Indo Global Shares.** Unbeknownst to Plaintiffs, Mark Miller sold the Indo Global shares to Tiger Trout Capital in multiple transactions between November 2019 and February 2020. According to the deposition testimony of Alan Masley, the owner of Tiger Trout Capital, the total amount paid for the shares was two hundred nineteen thousand one hundred thirty-eight dollars and seventy-five cents. Miller deposited the proceeds into a bank account at American National Bank of Minnesota that he had opened in the name of CCC without the knowledge or authorization of Plaintiffs.

7. **Diversion of Proceeds.** On December 16, 2019, Miller received a wire transfer of $120,825 from Tiger Trout Capital. On the same date, Miller transferred forty thousand dollars to a savings account, wired ten thousand dollars to himself, and wired sixty-two thousand four hundred twelve dollars and fifty cents to Market Cap Concepts LLC. Plaintiffs never received any of the proceeds from the sale of the Indo Global shares as required under the agreement.

8. **Miller's False Denials.** On January 20, 2020, in response to an inquiry from David Goulding, Mark Miller falsely denied selling any of the Indo Global shares, stating that nothing further transpired from Indo Global and that it was a dead end on every aspect. It was not until discovery commenced in this case that Mark Miller admitted to selling the shares.

9. **Elimination of Shareholders.** On August 6, 2023, Mark Miller and Jennifer Miller filed Amended and Restated Articles of Incorporation with the Colorado Secretary of State, which included a Unanimous Written Consent of the Directors dated June 15, 2022. This document purported to direct the transfer agent to remove from the records all shareholders associated with the predecessor company prior to the new formation date, effectively eliminating the entire interest of the rightful shareholders of CCC. On December 13, 2024, less than thirty minutes prior to his deposition, Mark Miller filed Articles of Amendment with the Colorado Secretary of State implementing a one million for one reverse split of all common stock, with any fractional shares to be redeemed for ten cents per share and all remaining unclaimed stock to be permanently cancelled.

10. **Pattern of Similar Misconduct.** The misconduct underlying Miller's criminal conviction is strikingly similar to the conduct alleged in this civil case. In both cases, Miller engaged in a pattern of fraudulent conduct involving the unauthorized takeover of corporate entities, the filing of false corporate documents, the misappropriation of corporate assets, and the diversion of proceeds for his personal benefit. The SEC case involved Miller's fraudulent manipulation of penny stock companies, including the filing of

false documents with state authorities and the misappropriation of corporate assets. Similarly, in this civil case, Miller filed false documents with the Wyoming and Colorado Secretaries of State, falsely claimed ownership and control of CCC, misappropriated the Indo Global shares owned by CCC, and diverted the proceeds from the sale of those shares.

**Legal Basis**

11. **Admissibility Under Federal Rule of Evidence 404(b).** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith, but may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. USCS Fed Rules Evid R 404.

12. **Pattern of Similar Misconduct.** Miller's criminal conviction in the SEC case is admissible to show a pattern of similar misconduct, including the unauthorized takeover of corporate entities, the filing of false corporate documents, the misappropriation of corporate assets, and the diversion of proceeds. This pattern of conduct is directly relevant to the civil claims in this case, which involve the same types of fraudulent activities. The evidence demonstrates Miller's motive, intent, and absence of mistake in engaging in the conduct alleged in this case.

13. **Impeachment Under Federal Rule of Evidence 609.** If Miller testifies at trial, his criminal conviction is admissible for impeachment purposes. Evidence of a criminal conviction is admissible to attack the credibility of a witness if the crime was punishable by death or imprisonment in excess of

one year, or if the crime involved dishonesty or false statement. USCS Fed Rules Evid R 609.

14. **Illinois Law on Impeachment.** Under Illinois law, no person shall be disqualified as a witness by reason of conviction of any crime, but such conviction may be shown for the purpose of affecting the credibility of such witness. 735 ILCS 5/8-101. Miller's criminal conviction for hijacking public companies and misappropriating funds company, including relating to Capitol Capital Corporation is directly relevant to his credibility and may be introduced to impeach his testimony if he testifies.

15. **Probative Value Outweighs Prejudicial Effect.** The probative value of Miller's criminal conviction substantially outweighs any prejudicial effect. The conviction is highly probative of Miller's pattern of fraudulent conduct, his motive and intent in engaging in the conduct alleged in this case, and his credibility if he testifies. The evidence is not unfairly prejudicial because it is directly relevant to the issues in this case and does not involve inflammatory or emotional content that would improperly influence the jury.

**Motion III: To Permit Remote Testimony via Zoom for John O'Shea, if deemed necessary**

**Facts**

16. **John O'Shea's Residence.** John O'Shea is an individual residing at 39 Jackson St. Kilda Vic 3182 Australia. He is one of the named Plaintiffs in this case and is a shareholder of Capitol Capital Corporation. O'Shea was a party to the July 19, 2019, agreement regarding the distribution of proceeds from the sale of the Indo Global shares.

17. **Distance and Cost of Travel.** John O'Shea resides in St. Kilda Vic, Australia, which is approximately nine thousand miles from Chicago, Illinois. The cost of travel from Australia to Chicago for trial would be substantial, including airfare, lodging, and other expenses.

**Melbourne → Illinois (Chicago) Travel Reality**

**1) No Direct Flights (Key Point)**

- There are **NO direct flights** from Melbourne to Illinois (Chicago).

- Every trip requires **at least 1–2 stopovers** (commonly via Los Angeles, San Francisco, Dallas, Hong Kong, etc.)

  This alone introduces:

- Multiple boarding processes

- Immigration/transit delays

- Missed connection risk

**2) Actual Travel Time (Door-to-Door Reality)**

**Flight Time Only (Best Case)**

- Approximately **19.5 – 20 hours actual flying time**

  **Realistic Total Travel Time (Including Stops)**

- Typical total journey: **23 – 26+ hours one way**

- Some routes (e.g. via Asia): **~25 hours+**

  **With Delays + Airport Time**

  Add:

- 2–4 hours pre-departure (international check-in/security)

- 2–5 hour layover(s)

- 1–2 hours immigration on arrival

10

- Likely delays / buffer

**Realistic door-to-door: 26 – 32+ hours one way**

**3) Number of Flights / Frequency**

- Multiple airlines operate **daily connecting flights**

- Example:

o Over **100+ connecting flights weekly** on major carriers

- BUT:

o All involve connections

o Timing depends heavily on stopover availability

There is **no simple "hop on a plane" option**

**4) Time Zone Impact (Critical for Court Argument)**

- Illinois (Chicago) is **~16 hours behind Melbourne**

Effects:

- Severe jet lag (often 2–4 days recovery)

- Cognitive impairment (fatigue, reduced focus)

- Not ideal for legal proceedings requiring clarity

**5) Total Time Commitment (Real World)**

**Minimum Trip Impact**

- Travel to Illinois: **~1.5 days**

- Recovery from jet lag: **2–3 days**

- Court attendance: **1 day**

- Return travel: **~1.5 days**

**Total disruption: ~6–8 days minimum**

**6) Physical & Logistical Burden**

11

- 15,500+ km travel distance

- Long-haul fatigue (20+ hour flights)

- Multiple transfers with baggage

- Risk of delays, missed connections, cancellations

  **In Summary:**

  **1. Extreme Travel Burden**

- Nearly **30 hours each way**

- Requires multiple international connections

  **2. Disproportionate Impact**

- ~1 week disruption for what may be a short court appearance

  **3. Health / Cognitive Impact**

- Jet lag + fatigue materially affect ability to participate effectively

  **4. No Reasonable Alternative Route**

- No direct flights exist

- Travel complexity is unavoidable

  **Simple Court-Ready Summary**

  Travel from Melbourne, Australia to Illinois requires no direct flights and

  typically involves 1–2 international stopovers. Total travel time is

  approximately 26–32 hours each way, excluding delays. The journey spans

  over 15,500 km and results in a 16-hour time difference, causing

  significant jet lag and requiring several days of recovery. The total impact

  of attending in person is approximately 6–8 days

18. **Availability of Remote Testimony Technology.** The Court has the

    capability to receive testimony by contemporaneous transmission from a

12

different location via Zoom videoconference. This technology allows witnesses to testify remotely while maintaining the integrity of the trial process, including the ability of the jury to observe the witness's demeanor and credibility.

**Legal Basis**

19. **Remote Testimony Under Federal Rule of Civil Procedure 43(a).** In the event that his testimony is deemed necessary, the court may permit testimony in open court by contemporaneous transmission from a different location. USCS Fed Rules Civ Proc R 43.

20. **Good Cause and Compelling Circumstances.** Good cause and compelling circumstances exist to permit John O'Shea and to testify remotely via Zoom. O'Shea resides in Australia, approximately nine thousand miles from Chicago, and the cost and inconvenience of requiring him to travel to Chicago for trial would be substantial. Permitting remote testimony would reduce the cost and burden on the witnesses while maintaining the integrity of the trial process.

21. **Appropriate Safeguards.** Appropriate safeguards can be implemented to ensure the integrity of the remote testimony. The Court can require that the witnesses testify under oath, that the testimony be recorded, and that the jury be able to observe the witnesses via video transmission. The Court can also require that counsel for the parties be present at the remote location to ensure that the testimony is conducted in accordance with the rules of evidence and procedure.

22. **Remote Testimony is in the Interest of Justice.** Permitting remote testimony for John O'Shea, to the extent that his testimony is necessary, is in the interest of justice. Requiring him to travel to Chicago for trial would impose a significant hardship and expense that is not justified by the marginal benefit of live testimony over remote testimony. Remote testimony via Zoom allows the witnesses to testify while minimizing the cost and inconvenience to the witnesses and the parties. In the alternative, John O'Shea is willing to waive his right to testify.

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

1. An order admitting into evidence the criminal conviction and guilty plea of Defendant Mark Miller in *United States v. Miller, et al,* **U.S. District of Minnesota (DMN) 0:21-cr-00142-DSD-ECW (2021)**, to demonstrate a pattern of similar misconduct relevant to the civil claims in this case and to impeach Miller's credibility if he testifies.

2. An order permitting remote testimony via Zoom for John O'Shea (residing in Australia) at trial in Chicago.

3. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

Plaintiffs David Goulding, Howard Salamon, Robyn Goulding, and John O'Shea

s/s David Goulding, s/s Howard Salamon, s/s Robyn Goulding, s/s John O'Shea

Dated: April 13, 2026